WHITE, TREASURER, ET AL. *v.* MECHANICS SECURITIES CORPORATION.

UNITED STATES *v.* SECURITIES CORPORATION GENERAL.

WHITE, TREASURER, ET AL. *v.* SECURITIES CORPORATION GENERAL.

UNITED STATES *v.* EQUITABLE TRUST COMPANY OF NEW YORK.

HICKS, ALIEN PROPERTY CUSTODIAN, ET AL. *v.* EQUITABLE TRUST COMPANY OF NEW YORK.

APPEALS FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

HICKS, ALIEN PROPERTY CUSTODIAN, ET AL. *v.* MERCANTILE TRUST COMPANY.

UNITED STATES *v.* MERCANTILE TRUST COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 423, 424,[1] 425,[1] 430, 431, 809, 810. Argued December 1, 2, 1925.—Decided December 14, 1925.

1. Under Jud. Code § 240, as amended by the Act of Feb. 13, 1925, a case pending undecided in the Circuit Court of Appeals on appeal from a decree of the District Court may be brought to this Court by certiorari. P. 299.

---

[1] By stipulation of counsel it was agreed that the disposition of the following cases: No. 427, *White, Treasurer, et al.* v. *Borland, Trustee;* No. 429, *White, Treasurer, et al.* v. *Stralem et al.;* No. 433; *White, Treasurer, et al.* v. *American National Bank of St. Paul;* No. 435, *White, Treasurer, et al.* v. *Hilken;* No. 437, *White, Treasurer, et al.* v. *Garbat;* No. 439, *White, Treasurer, et al.* v. *Thalman;* No.

2. Under § 9 of the Trading with the Enemy Act, a suit may be maintained by private parties against the Alien Property Custodian and the Treasurer of the United States to collect notes of the late Imperial German Government out of its funds seized by the Custodian, without making the present German Government a party. P. 300.

3. The disposition made of such enemy funds by the Trading with the Enemy Act was within the powers of Congress, recognized by our Treaty with Germany ending the war. *Id.*

4. By the Trading with the Enemy Act the United States with respect to funds of an enemy government seized by the Alien Property Custodian assumed the position of trustee for the benefit of claimants, and renounced its power to assert a claim of its own, except on the same footing and in the same way as others, if at all. P. 301.

5. Admissions made under oath by the Alien Property Custodian and the Treasurer of the United States in their answer in a suit against them under the Trading with the Enemy Act, to the effect that funds seized by the former and deposited with the latter belonged to the Imperial German Government, are evidence against them in that and in other like cases. P. 301.

6. Such admissions are conclusive in the case in which made, in the absence of other evidence to the contrary; and their force as evidence does not depend upon the authority of the Custodian to determine the fact admitted. *Id.*

4 Fed. (2d) 619, 624, affirmed.

OF the above entitled causes, Nos. 423, 425 and 431 were appeals from decrees of the Court of Appeals of the

441, *White, Treasurer, et al.* v. *Republic Trading Company;* No. 443, *White, Treasurer, et al.* v. *Kaufman,* and No. 445, *White, Treasurer, et al.* v. *Hecksher* should abide the decision announced by the Court in No. 425, *White, Treasurer, et al.* v. *Securities Corporation General,* and that the disposition of the following cases: No. 426, *United States* v. *Borland, Trustee;* No. 428, *United States* v. *Stralem et al.;* No. 432, *United States* v. *American National Bank of St. Paul;* No. 434, *United States* v. *Hilken;* No. 436, *United States* v. *Garbat,* No. 438, *United States* v. *Thalman;* No. 440, *United States* v. *Republic Trading Company;* No. 442, *United States* v. *Kaufman;* and No. 444, *United States* v. *Hecksher,* should abide the decision announced by the Court in No. 424, *United States* v. *Securities Corporation General.*

District of Columbia affirming decrees rendered by the Supreme Court of the District in three suits brought under § 9 of the Trading with the Enemy Act, sustaining the plaintiffs' claims and directing the Treasurer of the United States to pay the respective amounts found due, with interest; Nos. 424 and 430 were appeals from decrees of the Court of Appeals of the District dismissing appeals taken by the United States from orders entered by the Supreme Court of the District striking out suggestions filed on behalf of the United States in causes Nos. 425 and 431; Nos. 809 and 810 were writs of certiorari issued for the purpose of reviewing a decree of the District Court for the Eastern District of Missouri, awarding like relief to another claimant under the Act, and overruling suggestions filed on behalf of the United States. The certiorari was directed to the Circuit Court of Appeals before which appeals from the last mentioned decree were awaiting argument.

*Mr. Dean Hill Stanley,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* and *Assistant Attorney General Letts* were on the briefs, for appellants and petitioners.

Appeal lies to this Court from the Court of Appeals of the District of Columbia in suits under the Trading with the Enemy Act. *Behn, Meyer & Co., Ltd.* v. *Miller,* 266 U. S. 457; *Banco Mexicano* v. *Miller,* 263 U. S. 591; *Swiss National Ins. Co. Ltd.* v. *Miller,* 267 U. S. 42; *Compagnie Internationale de Produits, etc.* v. *Miller,* 266 U. S. 473.

The Supreme Court of the District of Columbia, and the District Court in Missouri, were without jurisdiction, because the suits involved adjudication as to the conduct and obligations of a foreign sovereign. A sovereign can not be sued in its own courts or in the courts of any other sovereign without its consent. *Beers* v. *State of Arkansas,* 20 How. 527. Nor can an affirmative judgment be

awarded by the courts of the United States against a foreign sovereign in a case where the sovereign has instituted a suit in its own name in courts in the United States. *French Republic* v. *Inland Navigation Co.,* 263 Fed. 410. Nor are the funds of a foreign sovereign on deposit in the United States subject to attachment, *Kingdom of Roumania* v. *Guaranty Trust Co.,* 250 Fed. 341; *Hassard* v. *United States of Mexico,* 29 Misc. 511; 46 App. Div. 623 and 173 N. Y. 645. Nor will a process in admiralty issue against a vessel which is the property of a foreign sovereign, even though the sovereign is engaging in commerce. *The Maipo,* 252 Fed. 627; *The Adriatic,* 258 Fed. 902; *Molina* v. *Comision Reguladora del Necardo de Henequen,* 92 N. J. L. 38; *Underhill* v. *Hernandez,* 168 U. S. 250; *Oetjen* v. *Central Leather Co.,* 246 U. S. 297; *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347; *Ricaud* v. *American Metal Co.,* 246 U. S. 304.

The suits provided for under § 9 of the Trading with the Enemy Act are suits of individuals against individual debtors, and Congress did not contemplate when § 9 was passed that it should apply to suits upon the debts of a government. But even assuming that Congress intended to permit suit against an enemy government, to that extent § 9 is unconstitutional. Claims against a foreign sovereign by a citizen of the United States are subject only to diplomatic negotiations even though the United States may be at war with the foreign state. Congress can not invest the courts with authority to pass judicially upon political questions. See *Hayburn's case,* 2 Dall. 410, and note on 409; *United States* v. *Ferreira,* 13 How. 39; *United States* v. *Todd,* 13 How. 51, note; *Gordon* v. *United States,* 117 U. S. 697; *Ex parte Riebeling,* 70 Fed. 310; *Ex parte Gans,* 17 Fed. 471; *United States* v. *Queen,* 105 Fed. 269; *United States* v. *Hay,* 20 App. D. C. 576. The act of the sovereign in these cases was essentially an act by the sovereign in its sovereign character. See

*Twycross* v. *Dreyfus,* 36 L. T. R. 752; *Wulfsohn* v. *Russian Socialist Federated Soviet Republic,* 234 N. Y. 372.

There is no evidence to prove that there is in the Treasury any money which, at the time of seizure, belonged to the Imperial German Government, or that the Alien Property Custodian has in his possession property out of which the claims of the appellees may be paid. The Custodian is the official, by delegation from the President, who seizes both money and property. Whenever he seized money he was under a mandatory duty to deposit it in the Treasury. This relieved him of all duty and authority with respect to such money. Not only is the money removed from the control of the Custodian, but he has nothing to say with respect to the manner of investment of the funds. This investment is to be made by the Secretary of the Treasury, who in turn is to be controlled by rules and regulations made by the President. Furthermore, the time of the sale of these securities after the end of the war is to be decided by the President, for the Act provides that as soon after the end of the war as the President shall deem practicable such securities shall be sold and the proceeds deposited in the Treasury. It is difficult to understand how Congress could have more completely removed the control and handling of money from the jurisdiction of the Custodian. See *Max Henkels* v. *Miller, as Alien Property Custodian,* 4 Fed. (2d) 988.

A determination by the Custodian as to any money deposited in the Treasury pursuant to the Act is of no greater effect than a determination by a private citizen and has no evidentiary value with respect to the ownership of the money at the time of seizure. Once having secured possession of the money his right to make determinations with respect to it ceased, and all he could do was to deposit it in the Treasury. Thereafter any determination as to title could be made only by the President

acting under § 9 of the Act, or by a court acting under the same Act, or by Congress, which reserved to itself under § 12 of the Act the right to settle claims of enemies to the money. The determination by the Custodian of ownership is merely made for the purpose of securing possession of the property to the Custodian. *Central. Union Trust Co.* v. *Garvan,* 254 U. S. 554. See also *Stoehr* v. *Wallace,* 255 U. S. 239, and *Commercial Trust Co.* v. *Miller,* 262 U. S. 51, and numerous other cases.

There was no evidence to show the actual ownership of the money by the Imperial German Government at the time of seizure. To prove ownership the claimants relied entirely upon the allegations in an answer in another suit against the same defendants, to the effect that the Custodian, after he had seized the money as that of an "Unknown Enemy" and deposited it in the Treasury of the United States in accordance with the provisions of § 12, attempted to determine the money to be the money of the Imperial German Government.

The United States may assert its rights by means of a suggestion to the court by the Attorney General. *In re Debs,* 158 U. S. 564; *United States* v. *Beebe,* 127 U. S. 338, *Heckman* v. *United States,* 224 U. S. 413; *The Exchange,* 7 Cranch 116; *United States* v. *Lee,* 106 U. S. 196; *Stanley* v. *Schwalby,* 147 U. S. 508.

The United States is a "person" within the meaning of § 9 of the Trading with the Enemy Act, and is therefore a proper claimant under that section. The United States is both a body politic and a corporation. See *United States* v. *Maurice,* 26 Fed. Cas. 1211; *United States* v. *Tingey,* 5 Pet. 115; *Dixon* v. *United States,* 1 Brock. 177; *Res Publica* v. *Sweers,* 1 Dall. 41. The suggestion alleges an indebtedness owing to the United States from Germany prior to October 6, 1917. It also alleges the filing of a notice of claim as provided by the Act. The United States is, therefore, entitled to have its claims

adjudicated in these proceedings, since it is the holder of the money.  A suit against the Custodian under § 9 for the collection of a debt is in substance a suit against the United States.  *Banco Mexicano* v. *Miller*, 263 U. S. 591. The United States being in substance, therefore, the possessor of the money out of which plaintiffs seek to secure the payment of the debt, may properly assert its claim against the money by means of a suggestion.  Assuming that the United States is not a claimant under § 9, it is nevertheless entitled in this proceeding to assert its rights and to have them passed upon.  It is a general principle that the United States is not affected by any provision of a statute with respect to its claims, unless it is specifically mentioned in the statute.  *Dollar Savings Bank* v. *United States*, 18 Wall. 227; *Guaranty Co.* v. *Title Guaranty Co.*, 224 U. S. 152; *United States* v. *Herron*, 20 Wall. 251; *Lewis, Trustee* v. *United States*, 92 U. S. 618.

The Custodian and the Treasurer, as officers of the United States, may assert the claims of the United States against funds in the Treasury, out of which the claimant in a suit under § 9 of the Trading with the Enemy Act, also seeks to recover.  *Banco Mexicano* v. *Miller*, 263 U. S. 591; *Miller* v. *Robertson*, 266 U. S. 243.

*Mr. M. Carter Hall*, with whom *Mr. C. C. Carlin* was on the brief, for appellee, in Nos. 423, 424 and 425.

The Supreme Court of the District of Columbia was expressly given jurisdiction of these suits by § 9 of the Trading with the Enemy Act, as amended, and the decrees complained of do not infringe upon the sovereign rights of the Imperial German Government, or its successor.

Under its constitutional war power, Congress has the full and unrestricted right to seize and confiscate enemy property.  *Brown* v. *United States*, 8 Cranch 110; *Miller* v. *United States*, 11 Wall. 268; *Herrera* v. *United States*, 222 U. S. 558.  Having the greater power to confiscate

this money, it also had the lesser power to appropriate it for the payment of debts due by the German Government to American citizens.

The primary purpose of the Trading with the Enemy Act was to seize enemy property in order to prevent its use against the United States. One of its secondary purposes was to provide for the payment of debts due from enemies to American citizens, before the termination of the war. *Miller* v. *Robertson,* 266 U. S. 243; *Koscinski* v. *White, Treas.,* 286 Fed. 215. The Trading with the Enemy Act makes no distinction between enemy governments and enemy individuals. It does not make any difference between the German Government and the German nationals. In fact, in order that there should be no doubt upon the subject, in § 2, subsec. (b), Congress specifically defined the word "enemy" as including "the government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, or agent thereof." In arguing that this Court should read into § 9 an exception as to debts due American citizens by enemy governments, which finds no support in the language of or reasons for the Act, appellants are questioning the propriety of the enactment. *Oetjen* v. *Central Leather Co.,* 246 U. S. 302.

These suits are not in any real sense suits against the Imperial German Government, and do not involve an adjudication of rights or obligations of a foreign sovereign in contravention of established principles of international law. Neither the German Government nor German nationals have any rights in the property or money seized under the war power, except such as may be granted by Congress. The belligerent determines how far it will exercise the right of confiscation. *Rose* v. *Himely,* 4 Cranch 272; *Brown* v. *United States,* 8 Cranch 111; *United States* v. *Alexander,* 2 Wall. 404; *United States* v. *Padelford,* 9 Wall. 531; *Sprott* v. *United States,* 20 Wall. 459; *Haycraft*

v. *United States*, 22 Wall. 81; *Lamar* v. *Browne*, 92 U. S.
187; *Young* v. *United States*, 97 U. S. 39; *Hijo Case*, 194
U. S. 315; *Herrera Case*, 222 U. S. 558.   The German
Government itself, which has not intervened to assert its
rights, is the only party that would be in a position to
take advantage of the alleged unconstitutionality.   Not
only has it failed to do this, but, by the terms of the
Treaty of Peace with the United States it has expressly
consented that all of its property in the hands of the
Alien Property Custodian may be disposed of in accord-
ance with the laws of the United States in effect on No-
vember 11, 1921, the date of the ratification of the Treaty.

The solemn admissions of the sworn answer of the ap-
pellant, Miller, as Custodian, of the facts found by him
and his resulting determination of enemy ownership in
the Imperial German Government and of the appellant,
White, as Treasurer, of the facts with respect to the record
entries on the books of the Treasury in the name of the Im-
perial German Government, all as set forth in the answer in
the Mechanics Securities Corporation case, are conclusive.

The determination of enemy ownership by the Cus-
todian is an " exercise of governmental power."   Such
a determination, after investigation, has all the force and
effect of an executive order of the President.   No one other
than a person filing claims under § 9, and certainly no
enemy or ally of enemy, can dispute his determination.
Subject to the will of Congress, and subject to the rights
of claimants under § 9, the Custodian holds absolute title
to the money and property seized by him.   It will be
noted that § 7 (c), as amended, authorizes the seizure of
enemy property " which the President, after investigation,
shall determine is so owing or is so held."   Section 9 (a)
authorizes the restoration of property or payment of
money upon application to the President " to which the
President shall determine said claimant is entitled."   By
Executive Orders the President delegated his power under

§ 7 (c) and § 9 (a). The determination by the President, through the Attorney General, of the interest of a claimant under § 9 (a), is an act of no greater formality than his determination of enemy ownership through the Alien Property Custodian under § 7 (c), and yet his power to order the payment of debts without proof of enemy ownership by any of the claimants has never been questioned. The determination of the President, as well as the determination of the court, is binding on all enemies, or allies of enemies, whose money or property has been seized, regardless of the fact of ultimate ownership as between enemies. The determination of enemy ownership by the President, acting through the Custodian, operates to vest absolute title in the Custodian, and is final as against every one, except claimants under § 9. *Central Union Trust Co.* v. *Garvan,* 254 U. S. 554; *Stoehr* v. *Wallace,* 255 U. S. 239; *Munich Reinsurance Co.* v. *First Reinsurance Co.* 300 Fed. 345; *Siggfehr* v. *Miller,* 285 Fed. 953; *Garvan* v. *Bonds,* 265 Fed. 477.

Any person having any claim against property or funds in the hands of the Custodian must pursue his rights under § 9 of the Act, which is the only section providing for recovery of property or payment of debts. *Central Union Trust Co.* v. *Garvan, supra; Commercial Trust Co.* v. *Miller,* 262 U. S. 51; *Ahrenfeldt* v. *Miller,* 262 U. S. 60; *United States Trust Co.* v. *Miller,* 262 U. S. 58. Unless it can be fairly said that Congress intended the United States to be a claimant under the Trading with the Enemy Act, it follows that it can assert no claim to these funds. While it may be conceded that the United States is a "body politic" in a limited sense, only by the most artificial process of reasoning can the conclusion be reached that Congress intended the United States to be a "person" within the meaning of § 9 of the Act. When Congress passed the Trading with the Enemy Act, it waived the sovereign privilege of taking this enemy prop-

erty absolutely.  After having declined to take it for
itself as it had the power to do, to say that the United
States can or should file claims against German Govern-
ment property in the same manner as individual creditors,
makes the entire Act meaningless.  Had our Government
intended to confiscate this fund, it would never have en-
acted that part of § 9 of the Act relevant to this proceed-
ing, because the effect of this section is to give to indi-
vidual creditors, complying with the requirements of § 9,
rights against the funds belonging to Germany prior to
any rights of the United States.

As to the Government's contention that § 9, if con-
strued to apply to the payment of debts due American
citizens out of property of the Imperial German Govern-
ment, would be unconstitutional, the Court's attention is
directed to the provisions of the Treaty of Peace between
the United States and Germany, which appear to con-
clusively dispose of this question, as well as of the claims
of the United States as made herein.  By the terms of
the Treaty of Peace between Germany and the United
States, but also by the terms of the Treaty of Versailles
adopted and incorporated therein by reference, Germany
expressly relinquished the right to raise any question with
respect to the disposition of any property of the German
Government which had been seized by the United States
during the War.

*Mr. Samuel W. Fordyce,* with whom *Messrs. John H.
Holliday* and *Thomas W. White* were on the brief, for re-
spondent, in Nos. 809 and 810.

The District Court had jurisdiction by the express terms
of § 9 of the Trading with the Enemy Act.  The act is not
unconstitutional, and the decree does not infringe on the
sovereign rights of the German Imperial Government or
its successor.

The District Court found as a fact that there are now in
the Treasury of the United States funds which, at the time

of seizure by the Alien Property Custodian, belonged to the Imperial German Government. This finding of fact, being based on evidence, should not be disturbed by this Court, especially so because the Supreme Court of the District of Columbia and the Court of Appeals for said District have found the same fact, and under the two-court rule adopted by this Court such finding is binding upon this Court. The United States and its officers are bound and estopped by the sworn statement in the suggestion of the United States that the funds belonged to Germany; the suggestion and exhibits attached not only claimed the fund as having belonged to Germany, but also stated, under oath, that the funds actually had belonged to Germany. This suggestion was sworn to only a few days before the trial and is sufficient evidence in itself, without all the other evidence, upon which to base the judgment below. The evidence as to the fact of former German ownership of the funds was competent and conclusive, and there was no evidence to the contrary. The motion to dismiss and the original answer are both competent evidence against the defendants on the authority of *Pope* v. *Allis*, 115 U. S. 363, and *C. & N. R. R.* v. *Ohle*, 117 U. S. 123. The United States is bound by the admissions of its attorneys with like effect, as other litigants, *Kaelin and Sons* v. *United States*, 290 Fed. 242. Admissions of attorneys are grounds for the court's procedure equally as if established by the clearest proof. Under this principle, the briefs of counsel are admissible not only as admissions, but as explanations of the clients' admission in the pleadings and to show knowledge of the facts admitted. *Tevis* v. *Ryan*, 13 Ariz. 120, affd. 233 U. S. 273; *A. T. & S. F. Ry.* v. *Sullivan*, 173 Fed. 456 (C. C. A.); *James* v. *Railway Co.*, 201 Mass. 203; *Scaife* v. *Land Co.*, 90 Fed. 238; *Hilliard* v. *Lyons*, 180 Fed. 685; *Lyster* v. *Stickney*, 12 Fed. 609. Even though it is contended that the Alien Property Custodian had no authority to make

a specific determination of ownership pleaded in the original answer, his conclusions and determination amount to beliefs or statements of a party on information and belief, and are, therefore, binding upon the defendants. *C. & N. R. R.* v. *Ohle,* 117 U. S. 123; 2 Foster Fed. Practice, 6th Ed. § 330.

The funds in question have been *in custodia legis* since the actual filing of this suit, and their status cannot be changed except by court action. *Heidritter* v. *Elizabeth Co.,* 112 U. S. 294; *Central Trust Co.* v. *Garvan,* 254 U. S. 554; *Taylor* v. *Carryl,* 20 How. 583; *Farmers Loan & Trust Co.* v. *Railroad Co.,* 177 U. S. 51; *Koscinski* v. *White,* 286 Fed. 211; *Sigg-Fehr* v. *White,* 285 Fed. 949, 32 Op. A. G. 57.

Upon the seizure of the funds, title passed to the United States, subject to the provisions of the Trading with the Enemy Act, as amended; and by that Act the United States, as a belligerent, is not authorized to set up any claim to the funds, nor has the United States as a creditor of Germany a right to set up any claim as a defense to this suit.

*Mr. Frederic D. McKenney,* with whom *Messrs. Winthrop W. Aldrich, John Spalding Flannery* and *G. Bowdoin Craighill* were on the brief, for appellee, in Nos. 430 and 431.

The Supreme Court of the District clearly had jurisdiction, but the jurisdiction of the Court of Appeals to review the decrees may seriously be doubted. The cases did not come within the general powers of the Supreme Court defined in § 61 of the District Code of Law, but were special and peculiar. Section 226 of that Code, as to appeals, though broadly couched, does not apply in such special cases. There must be special statutory warrant for an appeal, *District of Columbia* v. *Prospect Hill Cemetery,* 5 App. D. C. 497; *Brightwood Railway* v.

*O'Neal,* 10 App. D. C. 205; *Bankers Surety Co.* v. *Security Trust Co.,* 39 App. D. C. 354. Again, the statutory right of appeal to that court vouchsafed by § 226 of the District Code is limited to "Any party aggrieved by any final . . . decree of the Supreme Court of the District of Columbia." Thus the very words of the statute would seem quite clearly to make an end of the so-called appeal by the United States in case 430 and other similar cases, for the United States was not a party in any sense or aspect of the case in the court below, and it never at any time sought to have itself made a party by intervention or otherwise. And neither Miller nor White was a party "aggrieved" by the payment to or seizure by the Alien Property Custodian, that officer having acquired no interest in the money or property itself other than as a simple bailee, subject to the order of the President or of the Supreme Court of the District of Columbia, it being provided in the statute itself that upon the establishment by claimant of the interest, title or debt claimed by him "the court shall order the payment . . . or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States, or the interest therein to which the court shall determine said claimant is entitled." When the court, acting within the sphere of its jurisdiction as prescribed by the statute, has spoken, the Custodian and the Treasurer have no option but to submit to its decree. See *Barksdale* v. *Morgan,* 34 App. D. C. 549.

If appeals from the orders and decrees of the Supreme Court of the District of Columbia to the Court of Appeals were intended, why did the Congress deem it necessary to make special provision for appeals in cases instituted in the District Courts of the United States while maintaining silence with regard to similar cases instituted in the Supreme Court of the District? Again, it is to be noted that in cases of application by claimant for allowance

made to the President and in event of order for payment being made by him, no provision for appeal by the Custodian or Treasurer to any other authority or power is even hinted at, either in the Trading with the Enemy Act or elsewhere. Section 9 (a), as we think, neither requires nor contemplates an appeal from or review of action by the Chief Executive, nor of the judicial proceedings had in the Supreme Court of the District of Columbia in connection with any such claims.

To establish the existence of jurisdiction in the Court of Appeals and this Court to hear and determine the case, it is hardly sufficient to recite the fact that, in the absence of protest or objection, other similar cases have been adjudicated by the same and other tribunals. *Fritch, Inc.* v. *United States,* 248 U. S. 458; *Baldwin Co.* v. *Howard Co.,* 256 U. S. 36; *Estate of Beckwith* v. *Commissioner of Patents,* 252 U. S. 538.

Rather than to make that full, frank and perfect disclosure which the statute evidently contemplates on the part of its administrative officers charged with the duties of sequestering and preserving enemy property, these defendants have preferred to mask their own superior knowledge with silence and to obstruct the courts in their endeavors to administer the law as written by demanding "strict proof" from plaintiffs less fully informed than they themselves presumably must be. In such circumstances, plaintiffs have met the burden as best they could and to the entire satisfaction of the trial and intermediate appellate courts, which have concurred in their findings respecting the facts and in their decree as to where the right of the matter lies. In such circumstances, and in the absence of a scintilla of evidence to the contrary, what true ground is or was there for contending, either here or in the court below, that the moneys in question were other than the former property of the sometime Imperial German Government? For purposes of seizure, the de-

termination of the Alien Property Custodian, after investigation, was final, in the absence of suit brought under § 9 for its return, and that whether "right or wrong." If such decision be final for purposes of the seizure and sequestration, why does it not remain final, acting as an estoppel against the Custodian when relied upon by a creditor of the detected and mulcted enemy, seeking, under express provisions of § 9, to establish his claim against such enemy, and to secure its satisfaction out of the sequestered property? It would seem to be strange that an Attorney General should be either expected or empowered to assert rights on the part of the United States in properties sequestered under the terms and in conformity with the provisions of a federal statute, contrary to the dispensatory terms of the statute itself. Neither originally nor since has § 9 contained any provision for joining the enemy debtor as a party defendant in any suit brought to establish any interest or claim in or to an enemy debtor's property which had been seized by the Custodian. *Spiegelberg* v. *Garvan*, 260 Fed. 302; *Koscinski* v. *White, Treasurer*, 286 Fed. 211; *Munich Reissuance Co.* v. *First Reissuance Co. (No. 2)*, 300 Fed. 345.

As to the suggestion of the United States that it should be permitted to share *pro rata* with its citizen claimants: The procedure demanded by the statute could not be applied to the United States. The supposed rights of the United States do not constitute "debts" in any sense known to our jurisprudence. The Trading with the Enemy Act does not purport to deal with reparations. That has been dealt with partly by treaties and is still the subject of exchanges between the two nations.

Mr. Justice Holmes delivered the opinion of the Court.

The cases numbered from 423 to 445 inclusive are appeals from decrees of the Court of Appeals of the District

of Columbia. They were decided under an opinion reported in 4 Fed. (2d) 619; No. 423 being disposed of *per curiam,* on the authority of that decision, in 4 Fed. (2d) 624. The other two cases, numbers 809 and 810, come here on writs of certiorari to the Circuit Court of Appeals for the Eighth Circuit granted last month by this Court after a decree for the plaintiff in the District Court, but before a decision by the Circuit Court of Appeals, in view of the fact that the questions raised had been presented to it by the above mentioned appeals. Judicial Code, § 240, as amended by the Act of February 13, 1925, c. 229, 43 Stat. 936.

The suits are bills in equity brought under the Trading with the Enemy Act of October 6, 1917, c. 106, § 9, 40 Stat. 411, 419; as amended by the Acts of June 5, 1920. c. 241, 41 Stat. 977, and March 4, 1923, c. 285, 42 Stat. 1511. They are all brought upon notes issued by the Imperial German Government and alleged to have been recognized by the present German Government. They seek to collect the amounts from funds alleged to have belonged to the Imperial Government and now in the hands of the Alien Property Custodian or the Treasurer of the United States under the above mentioned Act. The defences relied upon were: (1) that Germany had an interest in the fund and that the suits required a judgment as to the obligations of a foreign sovereign and that therefore the courts had no jurisdiction; (2) that there was no competent evidence that any funds in the hands of either of the defendants had belonged to the German Government and (3) that the United States had claims against Germany, arising out of the war, in excess of the funds and was entitled to satisfaction from those funds either in preference to other claims or at least on an equal footing with them. The last point is reinforced by a suggestion on behalf of the United States in all the cases except number 423 that it has filed notice of its claim

under oath, that the claims other than its own would more than exhaust the funds on hand, that it is entitled to priority, and that the Court should dismiss the other bills and proceed to establish the claims of the United States. The Court of Appeals of the District of Columbia in a careful opinion overruled the defence, dismissed the suggestion and affirmed decrees for the plaintiffs. We are of opinion that its decision and that of the District Court in Missouri were right.

The elaborate argument that was made against the jurisdiction of courts over actions against foreign governments or to examine the conduct of such governments is beside the mark. In these cases no judgment is asked against Germany or against property that it is entitled to defend. The funds were seized adversely by the United States in time of war. They are in its hands; it has declared by an Act of Congress what shall be done with them, and that is the end of the matter. There is no question that such a seizure and disposition are within its powers. *Brown* v. *United States,* 8 Cr. 110, 129. *Miller* v. *United States,* 11 Wall. 268. The treaty with Germany has recognized their effect. Article 1, according the rights asserted by the joint resolution of July 2, 1921, § 5, recited in the Treaty, 42 Stat., Part II, 1939. Turning then to the Trading with the Enemy Act we find in § 9 express authority to any person not an enemy to maintain bills like the present for satisfaction of debts owing from an enemy, out of the property that has come from such enemy into the Custodian's hands. By § 2 " enemy " as used in the Act is defined and stated to include the government of any nation with which the United States is at war. The jurisdiction is complete unless the suggestion of an adverse interest on the part of the United States should induce a different result.

We will take up the claim of the United States in this connection, as it is the only point that is entitled to any

serious consideration. The United States seized the property in question from an enemy and of course could do with it what it liked. When it comes into court and seeks to appropriate it there is a natural notion that it has elected to use its power. Its power could not be denied if the Attorney General were the complete mouthpiece of its will. But whatever his authority, it is subordinate to Congress; and Congress has more authentically declared the sovereign intent by the statute to which we have referred. The statute gives an absolute right to the suitor who comes within its terms, unqualified by any reservation of a superior lien in case the United States should be a rival creditor. Even assuming, notwithstanding *Davis* v. *Pringle,* 268 U. S. 315, 318, that the United States is a "person" given the right to sue by § 9, there is no reservation of priority in the Act, or of a right to intermeddle in the private suit of another, or of any advantage that it might have retained as captor of the fund. Whether from magnanimity or forgetfulness, it has assumed the position of a trustee for the benefit of claimants and has renounced the power to assert a claim except on the same footing and in the same way as others, if at all. There is no doubt an intermittent tendency on the part of governments to be a little less grasping than they have been in the past, and it may be that the enactment was intended to exhibit the self-denial that, whether intended or not, was achieved in the bankruptcy act with regard to the priority of liens. *Davis v. Pringle,* 268 U. S. 315. There is more reason for it when, as here, the competition is between claims imposed by reason of success in war, and those arising out of ordinary business transactions of citizens in time of peace.

With regard to the evidence, the contention on behalf of the United States does not seem to us to need more than a word of reply. The facts admitted by answer under oath of the Custodian and the Treasurer in one of the cases

were that the Custodian determined after investigation that five hundred and fifteen thousand five hundred and seventy-five dollars were owing to the German Government, that he demanded and received them under the Act, paid them to the Treasurer, and holds them in a special trust; that he afterwards collected and paid over to the Treasurer five million dollars in a special trust as from an unknown enemy, but later determined that two million two hundred thousand dollars of the latter sum were held when he received them for the Imperial German Government, and directed the Treasurer to transfer that amount to a special account to the credit of the Imperial German Government, and that this was done. It was pressed at great length that the Custodian had no authority to determine the fact, especially after the money had been transferred to the Treasurer. But it is immaterial whether he had that authority or not. He had authority to answer in his own case, and the admission of the two defendants under oath is evidence against them in other cases as it would be conclusive against them in the one where it was filed, in the absence of any evidence to the contrary. *Pope* v. *Allis,* 115 U. S. 363. No evidence to the contrary was given in any of the cases nor was any reason shown to doubt the fact.

*Decrees affirmed.*

MR. JUSTICE STONE took no part in this case.