PAUL HABERLAND, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29289.   Promulgated November 28, 1930.

*J. S. Y. Ivins, Esq.*, and *O. R. Folsom-Jones, Esq.*, for the petitioner.

*Prew Savoy, Esq.*, for the respondent.

**OPINION.**

ARUNDELL: The question for decision at the present stage of this proceeding is whether the profit on the sale of Garfield Woolen Mills stock, and the interest and dividends mentioned in the findings of fact, constituted income to the petitioner in 1918.

The interest and dividends were returned by petitioner as income for 1918, but he now claims that he erred in so doing, not for the purpose of establishing any right to a refund, but in support of his claim that none of the moneys received by the Custodian in 1918 were income to him in that year. Petitioner also alleges that he sustained a loss in 1918 as the result of the seizure of his property,

but conceding that he is barred from securing a refund, he urges this point only to show that he had no income.

Petitioner contends that the seizure of his property by the Custodian divested him of all property rights in it and its proceeds in the taxable year; that the Custodian held the stock and proceeds thereof as trustee for the United States and certain nonenemy claimants and not as trustee for petitioner; that it was not until the Act of Congress of June 5, 1920, that petitioner had any right to obtain the property held by the Custodian; and that the provisions of the Act of March 10, 1928, relating to Federal taxes on property seized by the Custodian do not apply to him because he had no income in 1918 upon which a tax could be imposed.

The Trading with the Enemy Act as originally enacted on October 6, 1917 (ch. 106, 40 Stat. 411), provided for the appointment of an Alien Property Custodian and required the conveyance to the Custodian of property of enemies and allies of enemies. The act vested the Custodian " with all the powers of a common-law trustee in respect of all property, other than money," conveyed to him, and gave him power, " acting under the supervision and direction of the President," to, manage and dispose of the property " if and when necessary to prevent waste and protect such property and to the end that the interests of the United States in such property or of such person as may ultimately become entitled thereto, or to the proceeds thereof, may be preserved and safeguarded." By Act of March 28, 1918, the Custodian was given the power to sell or dispose of seized property, under the supervision and direction of the President, " in like manner as though he were the absolute owner thereof." 40 Stat. 460. Other parts of the Act and amendments thereto which are pertinent here are set forth in the margin.[1]

---

[1] Sec. 12. * * * After. the end of the war any claim of an enemy or of an ally of enemy to any money or other property received and held by the Alien Property Custodian or deposited in the United States Treasury, shall be settled as Congress shall direct * * *. (40 Stat. 411.)

By Act of July 1, 1918 (ch. 113, 40 Stat. 645), the following provision was made with respect to taxes:

All taxes heretofore or hereafter lawfully assessed by any body politic against money or other property held by the Alien Property Custodian shall be paid out of such money or other property, and if that be insufficient, shall be charged and paid out of any other moneys or properties required from the same enemy or ally of enemy.

By Act of March 4, 1923, the provision relating to taxes was enlarged and read as follows:

Sec. 24. The Alien Property Custodian is authorized to pay all taxes (including special assessments), heretofore or hereafter lawfully assessed by any body politic against any money or other property held by him or by the Treasurer of the United States under this Act, and to pay the necessary expenses incurred by him or by any depository for him in securing the possession, collection, or control of any such money or other property, or in protecting or administering the same. Such taxes and expenses shall be paid out of the money or other property against which such taxes are assessed or in respect of which such expenses are incurred, or (if such money or other property is insufficient) out of any other

When the original Trading with the Enemy Act was under consideration in Congress, the House Committee on Interstate and Foreign Commerce, in recommending its passage, said in part:

The chief objects of this bill are (1) to recognize and apply concretely, subject to definite modifications, the principle and practice of international law interdicting trade in time of war, and (2) to conserve and utilize upon a basis of practical justice enemy property found within the jurisdiction of the United States. * * * To summarize, the purpose of the bill is not to create new international rules or practices, but to define and mitigate them. (H. Rept. 85, 65 Cong., 1st sess.)

The Senate Committee on Commerce, in its report on the bill, said in part:

It also provides for the care and administration of the property and property rights of enemies and their allies in this country pending the war. * * * Under the old rule warring nations did not respect the property rights of their enemies, but a more enlightened opinion prevails at the present time, and it is now thought to be entirely proper to use the property of enemies without confiscating it; * * *

The courts have also construed the Act as not resulting in confiscation of property seized. In *White* v. *Mechanics Securities Corporation*, 269 U. S. 283, creditors of the Imperial German Government brought suit to recover the amounts owing to them out of funds formerly belonging to that government and which had been seized by the Alien Property Custodian. The United States intervened, claiming prior rights to the fund because of claims against Germany. The Supreme Court sustained the right of the creditors to recover, and denied the claim of the United States that it had a superior right in the fund seized over other claimants. The court said in part:

The United States seized the property in question from an enemy and, of course, could do with it what it liked. When it comes into court and seeks to appropriate it there is a natural notion that it has elected to use its power. * * * Whether from magnanimity or forgetfulness, it has assumed the position of a trustee for the benefit of claimants and has renounced the

money or property held for the same person, notwithstanding the fact that a claim may have been filed or suit instituted under this Act. (Ch. 285, 42 Stat. 1511.)

By Act of March 10, 1928, several paragraphs were added to section 24, among which was the following:

(b) In the case of income, war-profits, excess-profits, or estate taxes imposed by any Act of Congress, the amount thereof shall, under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, be computed in the same manner (except as hereinafter in this section provided) as though the money or other property had not been seized by or paid to the Alien Property Custodian, and shall be paid, as far as practicable, in accordance with subsection (a) of this section. Pending final determination of the tax liability the Alien Property Custodian is authorized to return, in accordance with the provisions of this Act, money or other property in any trust in such amounts as may be determined, under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, to be consistent with the prompt payment of the full amount of the internal-revenue taxes. (C 167, 45 Stat. 254, 276.)

power to assert a claim except on the same footing and in the same way as others, if at all. There is no doubt an intermittent tendency on the part of governments to be a little less grasping than they have been in the past, and it may be that the enactment was intended to exhibit the self-denial that, whether intended or not, was achieved in the bankruptcy act with regard to the priority of liens.

In the case of *In re Gregg's Estate*, 266 Pa. 189; 109 Atl. 777 (certiorari denied 252 U. S. 588), it is said:

The Trading with the Enemy Act is not for confiscation of property. It is rather for its conservation. While if the President so direct, the money or property of an alien enemy may be taken by the government for its own purposes, the owner does not part absolutely with it. For after the end of the war his claim to it "shall be settled as Congress shall direct * * *."

In *Biesantz* v. *Supreme Council of Royal Arcanum*, 175 N. Y. S. 46, the court held:

In the exercise of its plenary power in this matter, Congress might have provided for the confiscation of enemy property; but it did not do so. The act on its face is plainly not confiscatory.

These conclusions of the courts are in line with the provisions of the Trading with the Enemy Act relating to the taxation of property in the hands of the Custodian and the taxing of income from such property. Had the enemy property been confiscated by the United States there would be no need for these provisions as the property and the income would not be subject to tax. Throughout all the provisions of the Trading with the Enemy Act and its various amendments there is a very striking lack of anything to indicate that Congress intended to exercise its war powers over enemy property to the extent of confiscation. That Congress had such power is well established, and had that been the intent it would have been an easy matter to have said so. In our opinion the seizure of petitioner's stock did not deprive him of all right and title therein, but his rights were merely suspended until it was determined what disposition should be made of it.

In section 24 of the Trading with the Enemy Act Congress has specifically applied the taxing acts to income arising out of property held by Custodian. The intent of Congress to apply the amendment of 1928 retroactively is manifest from the wording of subsection (b), referring as it does to "income, war-profits, excess-profits, or estate taxes imposed by any Act of Congress." At the time the amendment of 1928 was enacted the taxing acts imposing profits taxes had been repealed and unless the amendment is applied retroactively, the reference therein to such taxes is meaningless. Subsection (b) provides that "as far as practicable" the several kinds of taxes specified shall be paid "in accordance with subsection (a),"

which in turn authorizes the Custodian to pay taxes "out of the money or other property against which such taxes are assessed * * * or (if such money or other property is insufficient) out of any other money or property held for the same person * * *." In this case the Custodian no longer has the property of petitioner, and in view of the provision of subsection (b) limiting collection from the Custodian only "as far as practicable" it seems plain that the intent of section 24 is to permit the respondent in such cases to proceed against the person who had realized the income.

In the case of *Adele Kahle*, 17 B. T. A. 633, affirmed in *Kahle* v. *Commissioner*, 43 Fed. (2d) 61, the facts were similar to those here, except that in this case the petitioner filed a return and in the *Kahle* case the returns were made by a deputy collector under section 3167 of the Revised Statutes. We held in that case, following *Forstmann* v. *Ferguson*, 17 Fed. (2d) 659; affd., 25 Fed. (2d) 47, that income was taxable to the taxpayer in the year in which it arose even though the actual receipt of it was postponed until a subsequent year because of the intervention of the Custodian. In *Richard G. Wagner*, 9 B. T. A. 925, we found that the Custodian's seizure and management of the taxpayer's property resulted in a loss and we refused to sustain a tax where there was in fact no income. Here the seizure and sale produced a profit which inured to the benefit of the taxpayer and in our opinion the provisions of the Revenue Act of 1918 and section 24 of the Trading with the Enemy Act, as amended, require such gain to be taxed in the year in which it arose.

Petitioner makes the additional argument that, instead of realizing a profit in 1918, he sustained a deductible loss by reason of the seizure of his property by the Alien Property Custodian, and cites *United States* v. *S. S. White Dental Manufacturing Co.*, 274 U. S. 398, as authority. But that case involved the deduction by an American corporation of a loss sustained by reason of the seizure of its property by the sequestrator of the German Government. It does not follow with the facts reversed that the American Government will allow a loss to a German subject whose property it has seized. The Supreme Court had no difficulty in reaching the conclusion that the loss provision of the revenue acts might not be resorted to even by an American corporation where its property was effectually destroyed by prohibition legislation. *Clarke* v. *Haberle Crystal Springs Brewing Co.*, 280 U. S. 384. Petitioner suffered no deductible loss under the Revenue Act of 1918 when his property was taken over by the Alien Property Custodian pursuant to law.

*The proceeding will be restored to the calendar for hearing on the merits in due course.*