PAUL HABERLAND, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29289. Promulgated April 30, 1932.

*O. R. Folsom-Jones, Esq.,* and *J. S. Y. Ivins, Esq.,* for the petitioner.

*Prew Savoy, Esq.,* for the respondent.

1374

1376

OPINION.

ARUNDELL: Several of the questions involved in the present step in this proceeding may be disposed of without much discussion. The first is the question of the statute of limitations. We fail to see any merit in the petitioner's contention that the statute has run against assessment and collection. His return for 1918 was

filed on May 4, 1922, and the deficiency notice was issued April 28, 1927, less than five years after the date of filing. Petitioner argues that he was not taxable for the year 1918 and was not required to file a return. Whether he was taxable or not, he had sufficient income in 1918, as held in our previous report, to require the filing of a return. To the argument that the Alien Property Custodian should have filed a return for petitioner in 1919, it is a sufficient answer to point out that the Custodian did not do so. As far as we know, the Custodian has not yet filed a return on behalf of the petitioner, and if we are to base our decision on the premise that he should have done so, the present proceeding would resolve itself into a " no return " case with a consequent lengthening of the limitation period.

Petitioner produced no evidence whatsoever on the issue of the March 1, 1913, value of the common stock. The respondent determined that value to be $130 per share, and in the absence of any evidence we are bound to treat that figure as correct. *Avery* v. *Commissioner*, 22 Fed. (2d) 6.

Petitioner claims, in the event that he does not prevail on the other issues, that the tax on the profit on the sale of his stock should be limited under section 18(c) of the Settlement of War Claims Act of 1928, which provides that:

So much of the net income of a taxpayer * * * as represents gain derived from the sale or exchange by the Alien Property Custodian of any property * * * seized by him, may at the option of the taxpayer be segregated from the net income and separately taxed at the rate of 30 per centum.

In his brief counsel for respondent concedes that petitioner's case comes within the above quoted statutory provisions, that petitioner made a timely election, and that he is " entitled to have the capital net gains arising from the seizure and sale of his property by the Alien Property Custodian segregated and taxed at 30 per centum."

We have left, then, the question of whether petitioner is entitled to deduct from the gain on the sale of his Garfield Worsted Mills stock so much thereof as he subsequently invested in the Haberland Manufacturing Company. The pertinent provisions of the statutes are set out in the margin.[1] Briefly, they provide that property seized

---

[1] [Section 214(a)(12), Revenue Act of 1921.] If property is compulsorily or involuntarily converted into cash or its equivalent as a result of (A) its destruction in whole or in part, (B) theft or seizure, or (C) an exercise of the power of requisition or condemnation, or the threat or imminence thereof; and if the taxpayer proceeds forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary to expend the proceeds of such conversion in the acquisition of other property of a character similar or related in service or use to the property so converted, or in the acquisition of 80 per centum or more of the stock or shares of a corporation owning such other property, or in the establishment of a replacement fund, then there shall be allowed as a deduction such portion of the gain derived as the portion of the proceeds so expended bears to the entire proceeds. * * *

and sold by the Alien Property Custodian shall be treated as compulsorily or involuntarily converted, and that where the taxpayer proceeds forthwith and in good faith to expend the proceeds of the conversion to acquire other property " of a character similar or related in service or use," or to acquire 80 per cent or more of the stock of a corporation owning " such other property," then a deduction shall be allowed of a portion of the gain derived.

In approaching the question for decision here it must be borne in mind that the sections of the statutes quoted in the margin are relief provisions (*International Boiler Works Co.*, 3 B. T. A. 283; *Washington Market Co.*, 25 B. T. A. 576), and as such are to be liberally construed to effectuate their purpose. *Bonwit-Teller & Co.* v. *United States*, 283 U. S. 258.

Having this purpose of the statute in mind, we are of the opinion that petitioner's investment in the Haberland Company should be treated as taking the place of the Garfield stock if it otherwise meets the requirements of the statute. While the sums that he put into the new business were treated on the corporate books in the first instance as loans, it is shown by the evidence that petitioner intended to have stock issued to him from time to time to take the place of the loans. His intention in this respect was carried out to the extent that, beginning with January 2, 1923, the net amount of the advances was largely covered by stock issued at various times and charged to his account. At the beginning of 1923 his balance was $298,186.70 and on January 2 stock of the par value of $298,000 was issued to petitioner. By the end of 1924 his stock holdings amounted to $449,000, an amount not far below the net proceeds realized from the conversion of his Garfield stock. In these circumstances, it is our opinion that the advances made by petitioner out of the proceeds of the involuntary conversion of his stock should be treated as expenditures in the acquisition of other property, within the meaning of the revenue act.

The respondent places considerable stress on the fact that petitioner purchased sundry securities between October 26, 1921, and January 25, 1922. We attach no significance to those purchases as

[Section 18(d), Settlement of War Claims Act of 1928.] Any property sold or exchanged by the Alien Property Custodian (whether before or after the date of the enactment of the Settlement of War Claims Act of 1928) shall be considered as having been compulsorily or involuntarily converted, within the meaning of the income, excess-profits, and war-profits tax laws and regulations; and the provisions of such laws and regulations relating to such a conversion shall (under regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury) apply in the case of the proceeds of such sale or exchange. For the purpose of determining whether the proceeds of such conversion have been expended within such time as will entitle the taxpayer to the benefits of such laws and regulations relating to such a conversion, the date of the return of the proceeds to the person entitled thereto shall be considered as the date of the conversion.

the evidence shows that petitioner purchased them only as a temporary investment and intended to and did convert them into cash as and when he needed funds for the promotion of his new business. It is hardly to be expected that a fund approaching a half million dollars would be left lying idle for any considerable length of time, and petitioner apparently knew that some time must elapse before the new business could be organized and ready for operation. It was only natural that under the circumstances he should temporarily put his funds in income-producing securities.

If section 214(a)(12) of the Revenue Act of 1921 limited the acquisition to "similar" property, we might have some difficulty in finding that the petitioner's investment met the test, inasmuch as the Haberland Company's activities were similar to only one phase of those of the Garfield Worsted Mills. But the word "similar" is followed immediately by the phrase "or related," which, in our opinion, considerably broadens the scope of the statute and gives the taxpayer more latitude in making an investment than is contended for by the respondent in this case. The evidence establishes that the use of sizing is essential to the textile industry. Prior to the time that the Haberland Company's products came on the market it was the practice of textile mills to make their own sizing. The Garfield Worsted Mills had about 15 employees engaged in the making of sizing for its own use. The Haberland Company's customers were mostly textile mills which used its products in place of the sizing they had previously made. Only one exception is shown, and that is in the use of Hamaco to treat felt, which it would seem is not a far cry from the treatment of fabrics in the strictly textile business. In our opinion the business of the Haberland Manufacturing Company was "related to" that of the Garfield Worsted Mills within the meaning of the statute.

One of the requirements of the statute is that the proceeds of the conversion must be expended "forthwith." We had occasion to examine into this requirement to some extent in *Chickasha Cotton Oil Co.*, 18 B. T. A. 1144. We there quoted the definition of "forthwith" in Webster's New International Dictionary as follows:

Immediately; without delay; directly; hence, within a reasonable time under the circumstances of the case; promptly and with reasonable dispatch;—the meaning of the term in a particular case is relative to the circumstances.

Also, Bouvier's definition, cited with approval in *Dickerman* v. *Northern Trust Co.*, 176 U. S. 181: "As soon as by reasonable exertion, confined to the object, it may be accomplished."

It is shown by the account books of the Haberland Manufacturing Company that petitioner continued to advance funds to or for it during all the years from 1921 to 1930, inclusive. Prior to the open-

ing of petitioner's account on the company's books in April, 1922, he had advanced certain sums as shown by his check stubs. Advances thereafter purport to be recorded on the check stubs and also credited to his account on the company's books. The two records are not in agreement and it is impossible to determine from them the total amount advanced, but it appears that the total from 1921 to 1930, inclusive, was somewhere in the neighborhood of $500,000. Counsel for the petitioner computed the total amount advanced between November 3, 1921, and September 19, 1928, as $498,125.02. Granting that this aggregate is correct, it does not appear that the net amount of his advances was as much as that at any time. The credit to his account for advances was offset by numerous charges, in addition to stock issued, which for the most part are unexplained. In 1922, according to the company's ledger, petitioner's advances totaled $331,-840.10, but this was offset by various charges which at the end of the year left a balance in his favor of $298,186.70. By the end of 1923 his balance was reduced on the books to $16,783.09. There is an unexplained discrepancy between petitioner's account on the books and the company's balance sheet which lists among its liabilities $111,-924.86 as "loaned by Paul Haberland." Similar unexplained discrepancies appear in each of the years 1926, 1928 and 1929.

But passing these matters, we are of the opinion that not all of petitioner's expenditures, extending as they did over a period of nine years, can be said to have been made "forthwith." "A word * * * is the skin of a living thought * * *." *Towne* v. *Eisner*, 245 U. S. 418. Certainly the thought conveyed by the word " forthwith " is not in harmony with that contended for by petitioner, namely, that a taxpayer may spread the proceeds of the involuntary conversion over a long term of years and still fulfill the conditions of the statute. We can not conceive that it was intended in the enactment of the statute to withhold imposition of the tax over an indefinite number of years until such time as the newly established business could demonstrate its ability to stand on its own feet.

We are of the opinion, however, that at least a portion of petitioner's advances were made sufficiently soon after realizing the proceeds to come within the statute. He received the proceeds of the conversion on October 26, 1921, and on November 3, 1921, he caused the Haberland Manufacturing Company to be incorporated. The necessary ground for a plant was selected and construction begun in April, 1922. By the first of November, 1922, the plant was ready to, and did, begin operations. In the meantime petitioner found it necessary to make two trips abroad to select machinery and transact other business for the new corporation. We are convinced by petitioner's testimony that, considering all the circumstances, the

Haberland Manufacturing Company was organized and started to operate as quickly as was practicable. In our opinion the expenditures made by petitioner up to the time the company began operations and within ninety days thereafter may properly be considered as having been made under the conditions specified by the statute. The sums advanced during the first ninety days of operations were for the most part in large amounts which apparently were reasonably necessary to start operations, and hence were a part of petitioner's initial investment in the business. Thereafter the advances were in relatively small amounts until the latter part of 1923, which under the circumstances here we consider too remote to come within the statute. The amount we are able to determine may not be exactly the amount expended, but is based on what we consider the most satisfactory evidence offered. Petitioner read into the record a number of expenditures made as shown by his check stubs. While some of these were made prior to the opening of his account on the company's books, we do not know whether or not they were later taken up in the accounts under some of the indefinite descriptions given to a number of the credit items. On the other hand, the ledger account contains credits for which there do not appear to be corresponding check stubs. In this situation we have chosen the ledger account as being more likely to be an accurate reflection of what actually occurred, particularly in view of the fact that it contains charges as well as credits to petitioner's account. According to the ledger account, petitioner advanced a gross amount of $397,283.47 up to January 31, 1923. During the same period he was charged with $340,119.64, which included charges of $299,000 par value of stock and which should not be used as an offset as it represented a part of petitioner's investment in the business. The difference between the gross amount advanced, $397,283.47, and the net charges of $41,119.64, or $356,163.83, in our opinion, may properly be said to have been expended forthwith in the acquisition of property of a character related in use or service to that involuntarily converted and a deduction may be allowed on that basis.

While it does not appear pertinent to the issues here, it may not be amiss to record that at the hearing petitioner agreed to the terms of Article VI of Treasury Decision 4168, which provides that no person shall be entitled to the benefits of section 18(d) of the Settlement of War Claims Act unless he agrees to file at the proper time a return of all income for the taxable period in which he disposes of the property acquired from the proceeds of the conversion, and agrees to pay all internal revenue taxes in respect of such conversion.

Reviewed by the Board.

*Decision will be entered under Rule 50.*