FRISCHKORN DEVELOPMENT COMPANY, PETITIONER, *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 30496, 35170, 42452. Promulgated March 6, 1934.

*J. H. Amick*, *C.P.A.*, for the petitioner.
*F. R. Shearer*, *Esq.*, for the respondent.

OPINION.

MARQUETTE: These proceedings were consolidated. Docket Nos.
30496 and 42452 involve deficiencies in income tax for fiscal years
ended June 30, as follows:

| | |
|---|---|
| 1923 | $647. 89 |
| 1924 | 10, 575. 54 |
| 1925 | 1, 439. 52 |
| 1926 | 1, 630. 44 |
| 1927 | 1, 436. 02 |

Docket No. 35170 involves the liability of the petitioner as a trans-
feree of the property of the Frischkorn Homes Co., hereafter referred
to as the Homes Co., for a deficiency in income tax for the calendar
year 1922 in the amount of $28,381.84 and a delinquency penalty of
$7,095.46. The petitioner admits its liability as a transferee of, but
disputes the amount of the tax and also the penalty due from, the
Homes Co.

These proceedings were submitted on a stipulation, which is made
a part of this report, oral evidence, and certain exhibits. The issues
are (a) whether the Homes Co. realized taxable gain in 1922 on the
disposition of its assets to the petitioner and, if so, to what extent
such gain should be recognized; (b) whether a 25 percent penalty
for delinquency should be added to the tax, if any, due from the
Homes Co. for the year 1922; (c) the determination of the cost or
other basis of the petitioner, and its allocation (for the purpose of
ascertaining the gain derived from the subsequent realization and
disposition) of the assets acquired from the Homes Co. in April
1922; (d) whether, and to what extent, the gain of $66,366 derived
by the petitioner in the fiscal year 1922 from the disposition of cer-

tain real estate to the city of Detroit should be recognized for income tax purposes; and (e) determination of the cost or other basis to the petitioner of certain lands alleged to have been acquired by petitioner with the proceeds of the disposition of the real estate to the city of Detroit. The respondent makes claim for any increased deficiencies that may result from the determination made by the Board in these proceedings.

The petitioner was organized in 1919 under the laws of Delaware. On April 1, 1922, the Homes Co. transferred all its assets to the petitioner in consideration for 941 shares of the petitioner's 7 percent cumulative preferred stock having a par value of $94,100, petitioner's negotiable promissory note in the principal amount of $39,196, and the assumption by the petitioner of all its liabilities. The total cost or other basis of the assets so disposed of to the Homes Co. was $385,688.96. The respondent, in computing the gain to the Homes Co. arising from this transaction, valued the 941 shares of stock at $94,100 and the promissory note at $39,196. The liabilities assumed by the petitioner amounted to $349,796.08. On this basis the profit on the transaction was $97,403.12.

The note for $39,196 was payable in approximately two years after date and bore interest at 6 percent. It was secured by no lien, nor did it bear the signature of any other person than the petitioner. The note and all interest thereon was paid January 18, 1924, by the petitioner to E. S. Frischkorn, who acted as agent for the stockholders of the Homes Co. which was dissolved November 15, 1922. The amount of the payment was $43,155.85.

The petitioner's articles of incorporation authorized the issue of 1,500 shares of preferred stock each of the par value of $100. This stock was preferred both as to assets and dividends. Of this total amount, 950 shares were issued in May 1919 and 550 shares were issued in October 1919. Prior to April 1, 1919, the petitioner had retired 941 of these shares. Certain shares were retired at $102, others at $105, and others at $110 per share. On March 6, 1922, 12½ of these shares were retired. The 941 shares which had been retired were reissued in part payment for property of the Homes Co. and were issued directly to the 11 stockholders of that company in proportion to their stockholdings therein. All these stockholders were business associates of E. S. Frischkorn, who was the president of both companies. The shares thus issued to the stockholders of the Homes Co. were redeemed at par or over in October 1926, November 1926, and January 1927. The petitioner had never defaulted in the payment of the 7 percent dividend due on its preferred stock. The balance sheet of the petitioner as of April 1, 1922, and after taking over the assets and liabilities of the Homes Co., was as follows:

### ASSETS

*Cash:*

| | | |
|---|---:|---:|
| Dime Savings Bank | $12, 819. 33 | |
| Liberty Bonds and C.D.'s | 822. 50 | |
| | | $13, 641. 83 |
| Accounts Receivable | | 5, 754. 37 |

*Long Term Assets:*

| | | |
|---|---:|---:|
| Contracts Receivable | 734, 623. 26 | |
| Real Estate "Unsold Lots" | 534, 315. 58 | |
| | | 1, 268, 938. 84 |

*Deferred:*

| | | |
|---|---|---:|
| Taxes | | 2, 314. 58 |
| | | $1, 290, 649. 62 |

### LIABILITIES

*Current Liabilities:*

| | | | |
|---|---:|---:|---:|
| Notes Payable | | $14, 600. 00 | |
| Interest Payable | | 2, 571. 80 | |
| Contracts Payable in Default: | | | |
| Geo. Mende | $77, 999. 50 | | |
| Emil Chevillott | 74, 000. 00 | | |
| Henry Bender | 59, 455. 00 | | |
| | | 211, 454. 50 | |
| | | | $228, 626. 30 |

*Long Term Liabilities:*

| | | | |
|---|---:|---:|---:|
| Contracts and Mortgages Payable: | | | |
| Mary E. Winn | | 18, 500. 00 | |
| Mary Walker | | 16, 250. 00 | |
| John Bakhaus | | 17, 100. 00 | |
| Herman Bakhaus | | 5, 405. 00 | |
| Wm. Bakhaus | | 13, 000. 00 | |
| | | | 70, 255. 00 |
| *Commissions Payable* | | 115, 762. 88 | |
| Notes Payable "Frischkorn Homes Co." | | 39, 196. 00 | |
| | | | 154, 958. 88 |

*Liabilities:*

| | | |
|---|---|---:|
| Underland Contracts for Improvements | | 275, 655. 97 |
| Reserve for Maintenance | | 3, 603. 38 |

*Capital and Surplus:*

| | | |
|---|---|---:|
| 1,500 shares preferred stock | | 150, 000. 00 |
| Surplus—Unearned (represented by 1,500 shares no par common stock) | | 407, 550. 09 |
| | | $1, 290, 649. 62 |

The item "Contracts Payable in Default" represents land contracts of the Homes Co. which were past due but were in good standing. The inability of the Homes Co. to meet these liabilities when due was one of the principal causes for the transaction of April 1, 1922.

Business conditions in Detroit, where or near which the real estate of the petitioner was situated, were not good in 1921. In 1921 and in the early part of 1922 money was tight and hard to borrow. There was a large amount of unemployment. A large amount of the petitioner's land contracts was in default. Real estate was sluggish.

Sales had fallen off. The petitioner was a part of the group of Frischkorn corporations. All of them were engaged in the real estate business. The total sales of the group for the first six months of 1920 were $1,949,981; for the whole year 1920, $2,043,215; for the year 1921, $120,980; and for the first three months of 1922, about $16,000, as against sales of about $830,800 for the first three months of 1920.

The Homes Co. made its income tax return on the calendar year basis and its returns were due on March 15 of each year. For the year 1921 it did not file its return until September 28, 1923, and then only after notice of the delinquency had been given to it by the collector. The making of the returns for the Frischkorn group of 11 companies and 3 individuals was in the hands of an accounting firm assisted by an officer (Paul) of one of the corporations, who overlooked the making of the return for the Homes Co. As soon as notified, the return was made and filed, reporting a loss of $5,889.12. The Homes Co. did not report any gain arising from the transfer to the petitioner, but the balance sheets attached to the return disclosed that the stock and note of the petitioner had been substituted for its assets which were on hand at the beginning of the year.

In 1924, 70 acres of a larger tract owned by the petitioner and held for subdivision and sale were condemned by the city of Detroit for park purposes. The amount of the award, all of which was received by the petitioner, was $111,180. This money was first collected by the Frischkorn Real Estate Co., which was the collector for the whole Frischkorn group, and after receipt by the petitioner was deposited by it in the Dime Savings Bank in its general bank account. The following deposits were made in that bank from money derived from the award:

| | |
|---|---|
| May 12, 1924 | $34,803.23 |
| May 21, 1924 | 50,000.00 |
| May 31, 1924 | 10,000.00 |

The remaining part of the money received from the city was included in a remittance of $32,036.92 from the Frischkorn Real Estate Co. and deposited by the petitioner in the Dime Savings Bank on June 13, 1924. No replacement fund was set up and the moneys received from the condemnation award were not segregated, but were deposited in the petitioner's general account in the Dime Savings Bank. During the spring, summer, and fall of 1924 the petitioner was making large collections and disbursements which were respectively deposited and withdrawn from this bank.

The balance sheet of the petitioner as of June 30, 1924, shows cash in the amount of $18,370.52.

(1) On May 21, 1924, the petitioner purchased from Albert L. A. David a tract of land for which it paid by two checks totaling $32,338 of that date on the Dime Savings Bank. (2) On May 21, 1924, the petitioner entered into a contract with Eugenie O. Morell for the purchase of certain lands for which it made cash payments by checks of that date on said bank for the total amount of $14,555.05. (3) On May 21, 1924, the petitioner entered into a contract of purchase of land with Emile O. Morell and Eugenie O. Morell and made cash payments by two checks on the Dime Savings Bank of that date in the total amount of $22,153.05. (4) On July 9, 1924, the petitioner entered into a contract of purchase with Joseph J. Baker and wife, on which it made a cash payment by check of that date on said bank in the amount of $5,000. (5) On November 14, 1924, the petitioner entered into a contract of purchase of real estate with Anna David, for which it made a cash payment of $20,000, evidenced by two checks of that date of $10,000 each on the Dime Savings Bank. (6) On November 14, 1924, the petitioner entered into a contract with Ellen Ford for the purchase of land for which it made payment by check of even date on the Dime Savings Bank for the sum of $20,000.

All the above tracts of land were purchased for subdivision purposes, and were properties similar or related in service and use to the property condemned. The proceeds of the property condemned by the city of Detroit were used in the purchase of properties (1), (2), and (3).

Two questions grow out of the transfer of April 1, 1922, from the Homes Co. to the petitioner. They are, first, Did taxable gain result to the Homes Co. from the transfer? and, second, What was the proper basis upon which to compute the gain or loss to the petitioner on sales of the property so acquired? With respect to the first issue, the petitioner asserts that, since the transaction was in the nature of an exchange, no taxable gain was realized for the reason that neither the stock nor the note received in payment had on April 1, 1922, any readily realizable market value. Sec. 202 (c), Revenue Act of 1921.

With respect to the second issue, we are of opinion that petitioner's note for $39,196 should be included in the cost of the property to it, and this irrespective of its value when given. It was a direct obligation of the petitioner, accrued on its books, and a part of the cost of the property to it. Counsel for the petitioner asserts that, since section 9050 of the Compiled Laws of Michigan (1915) provides that every certificate of preferred stock shall contain a provision to the effect that it is redeemable at par at a certain time, therefore the petitioner's preferred stock constituted a contractual obligation.

The answer to this is that the statute referred to applies only to corporations organized under the laws of Michigan, while the petitioner was organized under the laws of Delaware. This, however, does not dispose of the petitioner's contention, since if the preferred stock had, when received, a fair market value, then it should be included in cost to the extent of that value. *Fred J. Collins*, 16 B.T.A. 1426; *I. C. Bradbury*, 23 B.T.A. 1352. Thus we have presented the questions of whether the stock had a readily realizable market value and whether it had a fair market value, and, if so, what that value was.

Petitioner introduced in evidence its balance sheet as of April 1, 1922. Not only does it not dispute the facts disclosed by the balance sheet, but, by introducing it in evidence, stands sponsor for it. That balance sheet shows that the $150,000 par value of petitioner's preferred stock had behind it assets of net worth of $557,550.09 and that each share of the stock of $100 par value was backed up with assets of the net worth of over $370. Of course, the same is true to a larger extent as to the note. Such a showing alone might not be sufficient to prove a readily realizable market value or even perhaps a fair market value, especially if the stock were that of a new concern just having been issued. But such is not the case; the petitioner had then been a going concern for nearly three years. It had a history. That history discloses that all of its 1,550 shares of preferred stock had been issued in May and October 1919, and that of this amount 941 shares had been called in and redeemed prior to April 1, 1922, for prices as high as $110 per share. It had not then and never has defaulted in payment of the dividend of 7 percent. It is further shown that the same 941 shares were issued in part payment for the assets of the Homes Co. Using the future as corroborative of the past (*Wright* v. *Commissioner*, 50 Fed. (2d) 727), we find that before the hearing of these proceedings this same stock had been again redeemed at more than par, and that the note and all interest thereon had been paid.

On the question whether the note had readily realizable market value, the petitioner introduced two officers of a certain bank, and as to whether the stock possessed such value, it introduced two stock brokers. The bankers testified that their bank would not have discounted the note and gave as their reasons, length of time the note had to run, the amount of secured indebtedness of the corporation which would have to be first paid, and, further, that it was not eligible for a rediscount in a Federal Reserve Bank. One of them stated that a good endorser might be a material factor on the question of whether the note would be discounted. We thus find that this witness was not so sure that the length of time the note had to

run would have precluded its discount. He also stated that his bank would not accept the stock as collateral in the absence of other security. The brokers stated that this stock could not have been quickly disposed of; that the public did not desire real estate stock because of the bad real estate conditions; and since (as they assert) this was a close corporation, the stock could have been sold only to insiders.

We would be disposed to give weight to the conclusions of these witnesses, although they go to the extent not only of attributing to these securities no readily realizable market value, but practically denying to them even a fair market value, if they had displayed any real knowledge of the petitioner's business history. Not one of them testified that he knew that history. Each confined himself to a balance sheet which all but one apparently then saw for the first time. The exception stated that perhaps, as an officer of his bank, he might have seen another balance sheet, but he was very uncertain about it. No effort was made to enlighten these witnesses as to petitioner's history or its business standing, nor were they told the peculiar history of the stock. One witness went so far as to state he did not desire to see the balance sheet. Instead of the balance sheet disclosing, as intimated by the bankers, that a large amount of the indebtedness of the petitioner was secured by liens, it showed that the total amount of lien indebtedness was something less than $300,000 out of a total liability including surplus and preferred stock of over $1,290,000.

Taking into consideration the amount of assets behind the note and the preferred stock and the history of the stock, we are of opinion that this note and stock had a fair market value at least equal to the face value of the one and the par value of the other. We are further of opinion that the testimony introduced by the petitioner is not sufficient to overcome the determination of respondent that the note and the stock had readily realizable market value. *George M. Wright*, 19 B.T.A. 541; affd., 50 Fed. (2d) 727; *Crowell* v. *Commissioner*, 62 Fed. (2d) 51; *Fesler* v. *Commissioner*, 38 Fed. (2d) 155. Cf. *Imperator Realty Co.*, 24 B.T.A. 1010. Since among the liabilities assumed by the petitioner was the tax liability of the Homes Co., the amount of the tax, when computed, should be added to petitioner's cost in computing gain or loss from the sale of the property acquired.

The only cause advanced for the failure of the Homes Co. to file its return for 1922 until after it had been notified by the collector that it was delinquent is, that for reasons unknown, a firm of accountants employed to make the return, and an officer of one of the Frischkorn corporations who was to assist them, failed or forgot to prepare

and file the return. This excuse is not sufficient. *Eagle Piece Dye Works*, 10 B.T.A. 1360; *Gus V. Winston*, 22 B.T.A. 1194; *Berlin* v. *Commissioner*, 59 Fed. (2d) 996.

Respondent asserts that the petitioner paid a commission to the Frischkorn Real Estate Co. out of the money received by it from the city of Detroit, and that this indicates that the proceeding by the city, although in the nature of a condemnation proceeding, did not result in an " involuntary " conversion as required by section 203 (b) (5) of the Revenue Act of 1924. That paragraph provides:

If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain or loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended.

This paragraph not only provides for an " involuntary " conversion, but also for a compulsory. conversion. However this may be, the evidence is clear that the petitioner did not desire that its property be taken for park purposes, and that the proceeding by the city was both compulsory and involuntary. Besides, we do not think any commission was paid. The petition in Docket No. 30496 alleges that the petitioner received from the city $111,180. which was $66,366 in excess of the cost of the property to it. Respondent, in his answer, admits the amount of the profit. In his deficiency notice he arrived at the same profit by determining that the cost of the acreage condemned was $44,814, and the amount received by the petitioner was $111,180.

It is true that the witness for the petitioner first testified that all that was received by it from the condemnation award was $94,803.23 and that the remainder was retained by the Frischkorn Real Estate Co. as commissions. He later testified that the remainder of the money derived from the city was included by the Frischkorn Real Estate Co. in the remittances of June 13, 1924, and that he did not know whether a commission had been paid. It is pertinent to point out that by the stipulation the Board is requested to determine to what extent the gain of $66,366 received from the city of Detroit should be recognized for income tax purposes. In view of these facts and of the utter incongruity of the idea of paying a commission for the collection of money which was the petitioner's for the asking,

we are of opinion that no commission was paid, and that the petitioner received all of the condemnation award.

The petitioner did not seek to set up a replacement fund. Cf. *Eastern Steamship Lines, Inc.*, 17 B.T.A. 787.

It asserts that there was no necessity to earmark the money received from the city in order to comply with the provisions of the above paragraph. We assent to this and also agree that the petitioner " forthwith " made its investments as that word is used in the paragraph. *Paul Haberland*, 25 B.T.A. 1370. While it is not necessary that the money be earmarked, still it is necessary that the petitioner show by proper evidence that the money received from the city was used for the purchase of the properties thereafter acquired. That this is a proper construction is made clear by the last sentence of paragraph 5, where it is provided that if any part of the money is not so expended, gain shall be recognized to an amount not in excess of the money not so expended. This clearly indicates that the money could not have been spent for a general purpose, and if so spent, that the taxpayer may use other money for the purchase of like property and still receive the benefits of the paragraph. The petitioner has afforded us no assistance in tracing the money. The only evidence on this issue was introduced by the respondent. From the evidence before us, however, we are convinced that the amount of $69,046.10 expended May 21, 1924, was derived from the proceeds of the condemnation, but we can not proceed further. We do not know how the bank account may have fluctuated. We find from the petitioner's return for the fiscal year ended June 30, 1924, that it had on hand on that date in cash, $18,370.52. The one thing that is clear is that it could not have had on hand the proceeds of the condemnation proceeding in an amount in excess of its cash. We do not know how much of its cash was in bank nor whether the bank balance had fallen to a lower sum. We are not able to determine whether any further proceeds of the condemnation remained on hand. While this is a relief provision and should be liberally construed, yet when one seeks to take advantage of its benefits he should be held to a full and open disclosure. Cf. *Rock Island A. & L. R. Co.* v. *United States*, 254 U.S. 141. The petitioner's gain should be recognized to the extent of the money not expended as required by the paragraph and its gain on the sale of the land acquired on May 21, 1924, should be computed under section 204 (a) (10) of the Revenue Act of 1924, *John J. Bliss*, 27 B.T.A. 803; *Chickasha Cotton Oil Co.*, 18 B.T.A. 1144. *Paul Haberland, supra*, is not in conflict with these views, since there the money found to be properly reinvested was clearly but circuitously traced into the investment. Such is not the case here.

*Judgment will be entered under Rule 50.*