The Columbus Die, Tool and Machine Company v. Commissioner.
Columbus Die, Tool & Mach. Co. v. Commissioner
Docket No. 21518.
United States Tax Court
1952 Tax Ct. Memo LEXIS 52; 11 T.C.M. (CCH) 1053; T.C.M. (RIA) 52312; October 28, 1952
John M. Hudson, Esq., for the petitioner. Lester M. Ponder, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This proceeding was brought for redetermination of deficiencies in Federal taxes as follows: Taxable Year Ended
April
April
April
30, 1942
30, 1943
30, 1944
Income tax
$42,956.87
$ 9,794.28
$27,433.52
Declared value
excess profits
tax
548.01
Excess profits
tax
3,447.50
11,935.84
25,150.73
The issues presented are as follows: 1. Whether petitioner was availed of for the purpose of preventing the imposition of surtax on its stockholders by permitting the profits *53 to accumulate beyond the reasonable needs of its business during the taxable years ended April 30, 1942, 1943 and 1944, within the meaning of section 102, Internal Revenue Code. 2. Whether petitioner realized recognizable long-term capital gain on the disposition of certain unimproved land to the United States Government during the taxable year 1944, the proceeds from such sale having been expended within three months of receipt for the purchase of another tract of unimproved land. 3. If the gain on the last above-mentioned land is not recognizable under section 112 (f), Internal Revenue Code, whether petitioner is entitled to the deduction of legal and professional expenses incurred in the disposition of the property as a business expense for the taxable year 1944. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, an Ohio corporation, organized in May 1906 has its office and place of business at 955 Cleveland Avenue, Columbus, Ohio. Petitioner was incorporated with authorized capital stock (all common) of 100 shares, par value $100 each, and at the time of incorporation 26 shares, par value $2,600, *54 were issued. At the time of its organization petitioner had 5 stockholders. Between 1914 and 1916 Harry H. Price, Sr., acquired a majority and controlling intered in the stock of petitioner's company. Beginning in 1912 the authorized, issued and outstanding capital stock was increased on several occasions by means of stock dividends totaling $397,400 by the year ended April 30, 1932. Petitioner declared and distributed a further stock dividend of $400,000 in December 1944. During the taxable years there were issued and outstanding 4,000 shares of stock, par value of $400,000, all of which, except for one share, was held and owned by Price, members of his family, and a trust created by him for the benefit of his wife and children. Price owned 2,075 shares and his wife owned 1,200 shares or a total of 3,275 out of the 4,000 shares outstanding during the taxable period. The capital stock of petitioner has been of only one class, namely common stock; no bonds have been issued by petitioner at any time, and none of its stock has been purchased, redeemed, or retired by petitioner at any time. During the taxable years Price, members of his family and Chester C. Moelchert, who is not related *55 to them, were the Board of Directors and officers of petitioner. Price has been President and Chief Executive Officer of petitioner since its organization. Moelcheart has been in petitioner's employ since 1913, and has been its Secretary since 1915 or 1916. Petitioner's plant is located in the northcast section of Columbus, Ohio, about two miles from the center of the city. The tract of land upon which the plant is located when originally acquired by petitioner in 1913-1914 consisted of 15.524 acres. The tract is bounded on the east by Cleveland Avenue (a main highway through the city sometimes called 3-C Highway), on the north by the Timken Roller Bearing Co. plant, on the west by the Pennsylvania and New York Central Railways, and on the south by a warehouse and interestate hauling company. Prior to 1914 petitioner rented factory space for the conduct of its business. The Cleveland Avenue property of 15.524 acres was vacant land when acquired by petitioner and was acquired by petitioner specifically for the purpose of building a factory. The parcel was rectangular in shape and its dimensions were about 600 feet or 554 feet frontage on Cleveland Avenue or the east boundary, by about *56 1,250 feet in a westerly direction along the north or Timken Co. plant boundary to the railroad main line tracks on the west boundary, by about 600 feet or 554 feet in a southerly direction along the west or railroad boundary to a point and thence about 1,250 feet along the south boundary in an easterly direction to Cleveland Avenue or the east boundary. The Cleveland Avenue property was well suited and adaptable to the business of petitioner. The ground is level for the most part, it is on grade level with Cleveland Avenue at the front of the property and about 2 1/2 or 3 feet above grade level with the railroad tracks at the rear of the property. There are, and were, no deep ditches or ravines and no impingements on the property. It was zoned for industrial use. The typical utilities are available to the property. Good public transportation was available by streetcar, which was the principal means of local transportation in those days (1914). The main line tracks of two principal railroads aboutted the property on the west and a spur track from the main lines was run into the property. It was located fairly close to the railroad freight houses, facilitating the hauling back and *57 forth of incoming and outgoing freight, shipments of which in those days were by railroad. It is on a main highway and directly across the street from the property is an older residential district occupied mainly by a working class of people. The plant or factory of petitioner consists of three buildings or structures erected at different times but joined together or integrated into one building. The first or No. 1 building was constructed in 1914 on the Cleveland Avenue front of the property, the cast end of the tract, and along the south boundary line, which abuts the property of the warehouse and interestate hauling company. This structure is set back about 25 feet from Cleveland Avenue and is a one-story structure except for a small portion in front devoted to office uses. It is of the sawtooth roof type of construction, with brick walls and steel concrete reinforced roof and wood flooring laid over a concrete sub-base, and the roof is supported by steel piers or columns 22 feet high and spaced at 20 foot intervals. The No. 2 building was constructed in 1928-1929 at the rear or west end of building No. 1, along the south property line, as an extension of No. 1, and is of the *58 same type construction but of smaller size. The No. 3 building was constructed in 1941 at the rear or west end of No. 2 building along the south property line, and is a monitor type building 50 feet wide by 100 feet long. The No. 1 building is of roughly square dimensions, substantially greater than the dimensions of No. 3 building, and the No. 2 building is of greater length than width, being about 1/2 as long and less than 1/3 as wide as the No. 1 building. The three structures are joined together as one building and are sometimes referred to as the main plant or building. As a single building the structures form a wide base L, with the No. 1 structure as the broad base or horizontal line and the No. 2 and No. 3 extensions as the narrow upright or perpendicular line. This main building covers an area of about 2 or 2 1/2 acres of the tract of land. In addition to the main building there are several outbuildings, consisting of a coal storage bin, two scrap sheds, a lumber shed and a garage, which are placed generally within the area of the L formed by the main building, i.e., at the rear of the north side of the No. 1 structure and roughly parallel to and on the north side of the No. *59 2 and No. 3 structures. Entering the property from the front or Cleveland Avenue side and a few feet from the north side of the No. 1 structure is a large driveway which petitioner has to have for big trucks coming in and unloading, with sufficient space to permit the big trucks to turn around after loading and unloading. From the west side of the property, abutting the main line railroad tracks, a spur railroad track runs into the property about 180 feet from the south boundary line. On May 25, 1942, the United States Government gave petitioner notice of intention to condemn 9.1 acres of its land, which were adjacent to that portion of the tract upon which the plant was constructed, and on the same date the Government filed suit in the United States District Court for the Southern District of Ohio, Eastern Division, for condemnation of such 9.1 acres. On December 31, 1943, after extended negotiations between the parties, the District Court entered its decree finding and determining, in conformity with the agreement between the parties, that $69,000, exclusive of interest, was just compensation for the land so condemned and directing payment of such amount to petitioner. The amount *60 of the award so determined was paid to petitioner on February 2, 1944. On February 7, 1944, petitioner applied to the Commissioner of Internal Revenue for permission to establish a replacement fund with the proceeds of the award and such permission was granted on April 17, 1944. The proceeds of the award, $69,000, were deposited by petitioner on February 2, 1944, in a special and separate bank account under the style of "The Columbus Die, Tool and Machine Co. - Replacement Fund" and the Commissioner of Internal Revenue was advised of such deposit. Petitioner also set up on its books on April 27, 1944, a separate account marked "Replacement Fund." The cost to petitioner of the 9.1 acres so condemned, as determined by the respondent for tax purposes, is $19,492.80. In connection with the condemnation of the 9.1 acres and in the conduct of the negotiations between petitioner and the United States preceding the entry of the Court's decree fixing just compensation petitioner engaged the services of a lawyer and of an independent real estate analyst and appraiser, and in the taxable year 1944 paid $2,508.90 for such services. The fair market value of the 9.1 acres on May 25, 1942, as determined *61 by the appraiser, was $75,000, or about $8,500 an acre. The 9.1 acre parcel taken by the Government was vacant land at the time of the taking and was a strip of the northern portion of the tract, contiguous on the north side to the area upon which petitioner's plant was constructed. Part of this parcel was used by petitioner for parking purposes. Petitioner considered that this parcel could be used by it in the event of future expansion. Prior to the condemnation of the parcel, the Timken Roller Bearing Co. and the Defense Plant Corporation discussed with Price the possible purchase of a portion of the parcel, but petitioner, through Price, refused to sell or put any price on the property, stating that petitioner needed it. Since the condemnation, buildings of Timken Company plant have been constructed on the parcel. The 9.1 acre parcel is irregular in shape. It has a frontage of 277 feet on Cleveland Avenue, being about 1/2 the Cleveland Avenue frontage of the entire tract previously owned by petitioner. The parcel condemned extends from Cleveland Avenue about 1,255 feet in a westerly direction along the northern boundary of the original tract to the main line railroad tracks, and *62 about 363.53 feet in a southerly direction along the railroad tracks. From thence the parcel runs in an easterly direction about 574 feet, and thence in a northerly direction 86.53 feet, and thence again in an easterly direction to Cleveland Avenue. After the taking of this parcel by the Government, petitioner had left about 6.4 acres of the original tract, of which about 2 acres are occupied by the main plant of petitioner, and additional portions are occupied by the several outbuildings of the plant. The main plant or building occupied about 190.47 feet of the Cleveland Avenue frontage left to petitioner, and the rest of the frontage, being 86.53 feet, is devoted to the wide driveway into petitioner's property which was necessary to accommodate the large trucks loading and unloading and turning around at the plant. The vacant land left to petitioner was a strip at the rear or west of petitioner's plant, being about 180 feet wide from north to south and 574 feet long from east to west, extending from the rear of the plant to the railroad. The railroad spur track occupying about 20 feet runs into the property along the new northern boundary line at the rear of the portion left to petitioner. *63 The vacant land left to petitioner after the taking of the 9.1 acre parcel is suitable for ordinary industrial use but was thought by petitioner not to be adaptable for future expansion of its plant and facilities. It was thought not to be of use because it was narrow and was about 3 feet above grade level with the railroad in the rear. On or about April 27, 1944, within three months from receipt by petitioner of the condemnation award, petitioner purchased from Price a tract of unimproved land consisting of approximately 18 acres. Petitioner paid Price $69,000 for the land, being the proceeds of the award received by petitioner from the United States for the condemned property. This tract of land, sometimes called the St. Clair Avenue property, is located at the northeast corner of 5th Avenue and St. Clair Avenue, Columbus, Ohio, about 5 blocks east of Cleveland Avenue and about the same distance from petitioner's plant. The dimensions and bounds of the tract, which is roughly rectangular in shape except for 69.5 feet by 315.5 feet out of the northwest corner, are 1411.6 feet on 5th Avenue, on the south, by 543.35 feet on the N & W and the Pennsylvania (C.A. and C.) railroads, on *64 the east, by 1112.75 feet on Shoemaker Avenue, on the north, by 468.85 feet on St. Clair Avenue, on the west. The topography is flat and level with the surrounding streets and railroad. The tract is zoned industrial property and is near the corner of East Fifth Avenue and Cleveland Avenue, which are thoroughfares east and west and north and south. Cleveland Avenue, a 3-C highway, is the highway that connects with all other highways leading into and out of Columbus. It is a corner property about on grade with the streets bordering on the south and west and with the main line of a principal railroad that is contiguous to and runs along the east side of the property, making readily available a spur track into the property. It has the advantage of public utilities and paved streets, and the same pool of labor is available as to the Cleveland Avenue property of petitioner. These factors and facilities - the zoning, size, shape, topography, railroad facilities, highway facilities and utilities - make the property best adaptable to industrial use. The fair market value of this property on April 12, 1944, as determined by an independent expert real estate analyst and appraiser, was about *65 $4,000 per acre. When the Government condemned the 9.1 acres petitioner knew that it would be necessary to acquire another site or tract of land similar to the Cleveland Avenue property so that it could expand as contemplated and build a modern type plant suitable to the efficient operation and conduct of its business and the economical manufacture of the type of work then being done and to be done in the future. The building or plant in which petitioner was operating was not suited to the type or class of work it was then doing and expected to continue, and it was known that, if petitioner was to continue and prosper in business, a new building would have to be built in a new location. The Cleveland Avenue property left to petitioner after the taking of the 9.1 acres was not suitable or adaptable to the purposes of expansion and improvement petitioner felt was necessary. The portion taken included about 280 feet of Cleveland Avenue frontage, which petitioner had intended to use for erection of a new building, and the vacant property left was irregular in shape, was not level ground, and was a long, narrow strip not suited for a building of the type required for petitioner's business. *66 Petitioner was one of the pioneer companies in the job tool and die business, and in the early days it did a lot of small work for which its buildings and equipment were adapted. In later years, sometime after World War I, petitioner undertook the manufacture of heavier machines or larger work in order to meet the competition of the great increase in small tool shops. The larger work required the use of heavier and larger equipment. Petitioner was able to perform this work in its existing plant, but it could have performed it with greater efficiency and economy if the plant were equipped with overhead travelling cranes. Petitioner's existing building does not permit the installation of such cranes. The officers of petitioner consulted Arthur E. Daley, an expert real estate analyst and appraiser of Columbus, Ohio, with respect to securing another tract of land somewhat similar to the Cleveland Avenue tract if they found it necessary to acquire a tract for future expansion. These consultations began soon after the condemnation. Daley was instructed to make a survey of available industrial properties in the general area of the Cleveland Avenue property, which he did, reporting his findings *67 to petitioner's officers from time to time. Daley also checked industrial sites in other sections of the Columbus area. He reported that the St. Clair Avenue property was the only tract in the general area of the Cleveland Avenue property approximating the original size of the Cleveland Avenue property and having similar attributes. Both the original Cleveland Avenue and the St. Clair Avenue properties are zoned as industrial properties; they are approximately the same size, shape, and dimensions, with railroads and main transportation facilities improved and adjacent. Prior to the taxable years petitioner's officers, directors, and accountant and consultant discussed the need for expansion and improvement of its plant. In 1939 or 1940 Price discussed plans for expansion and improvement of the plant with the Austin Company, a large contracting company which constructed petitioner's No. 3 building. Representatives of that company made some sketches for proposed buildings, but no completed blueprints or specifications were made. The plans were not carried out because of intervening obstacles and intervening conditions. The condemnation of part of the Cleveland Avenue property eliminated *68 the desirability of expansion on that site. During the war period, 1942 to 1945, petitioner found it necessary to devote all of its time to the production of war materials. After the termination of the war, business uncertainty and increasing high building costs caused petitioner to further postpone any plans for expansion and improvement. Petitioner intends at some time to build a new plant on the St. Clair Avenue property when conditions are more favorable. The St. Clair Avenue property was similar or related in service or use to the Cleveland Avenue property. Petitioner's business is the designing and manufacture of special machines and tools such as jigs and fixtures, i.e., special or single purpose machines and special parts. Petitioner is what may be called a jobbing tool shop or a special order jobbing machine factory and, in normal times, it does not produce any substantial amount of standard articles. Petitioner manufactures the machines and tools with which other manufacturers produce standard articles. In its early days it primarily produced "small work", but after World War I, this class of work was more or less abandoned to the smaller so-called alley machine shops, *69 and petitioner produced medium size or larger machines and tools. During World War II petitioner produced many standard parts under war subcontracts. During this period it also continued to manufacture some special machines and, after the war, it returned to its regular line of designing and manufacturing special machines, tools and parts. About 50% of petitioner's orders require it to design the product as well as manufacture it. Such orders require petitioner to design and produce a machine which will accomplish the desired purpose. For this type of work, petitioner maintains a staff of engineers and, if the job is particularly large, it employs additional engineers. Drawings and blueprints must be made and estimates are required of labor and materials as well as a layout of the job for the factory and the manufacturing operations when petitioner designs the product. There is a lapse of from thirty days on small tools to nine months or a year on orders for larger machines from the time of placing an order to the first shipment and invoicing, and the receipt of any payments on the order. During such interim petitioner has to pay out substantial sums, which sometimes amount to as *70 much as 60% or 75% of the contract price, for labor and materials before any payments are received by it. Petitioner occasionally received payment for one large order while working on other orders and, to this extent, its financing problem was diminished. Petitioner's business does not remain on a level plane from year to year, but runs in uneven cycles of varying volumes of business and widely fluctuating profits or losses. Petitioner does not have a steady or stable market or demand for its product, and it very seldom receives a repeat order for the products it manufactures. Its risks and hazards are substantial. Inadequate estimates may result in a loss or diminution of normal profits. Petitioner takes the risk of the failure of the products it designs to perform their required functions. Such failure may result in a loss to petitioner. Any business that utilizes the method of bidding on a price basis in order to obtain business faces risks and hazards. Petitioner obtained its business in this fashion. For the fiscal years ended April 30, 1917, to 1950, inclusive, the net sales, cost of goods sold, and the net profit or loss, not reflecting any adjustments by the Bureau of *71 Internal Revenue or with respect to renegotiation of excessive profits are as follows: Cost of
Net Profit
Year
Sales
Goods Sold
or (Loss)
1917
$ 322,843.68
$ 36,353.33
$ 56,016.02
1918
476,216.01
261,990.08
43,327.83
1919
557,833.07
310,134.90
45,746.22
1920
464,497.58
261,982.38
29,168.01
1921
436,448.70
244,223.94
40,810.67
1922
177,092.24
87,358.84
(10,272.26)
1923
150,679.71
77,061.46
(21,484.24)
1924
632,084.54
385,614.32
135,584.38
1925
197,962.93
146,007.30
(19,749.73)
1926
250,774.78
184,238.43
5,771.79
1927
279,782.57
205,561.91
14,753.37
1928
291,873.90
223,918.26
13,019.29
1929
420,356.27
359,582.81
(6,919.15)
1930
1,254,287.08
774,839.40
352,579.56
1931
132,219.13
99,741.45
(25,954.92)
1932
40,539.21
47,337.21
(38,884.20)
1933
20,555.88
26,511.55
(65,408.33)
1934
105,827.52
75,364.74
(1,758.28)
1935
84,768.92
67,815.09
(13,608.00)
1936
146,479.14
107,549.37
(5,342.65)
1937
310,401.64
219,486.55
26,001.20
1938
464,575.87
315,995.07
45,966.52
1939
114,060.53
105,233.30
13,136.69
1940
296,374.40
210,813.61
3,282.02
1941
589,552.59
351,500.98
70,112.82
1942
909,698.77
455,500.60
137,706.96
1943
1,692,555.58
766,858.53
212,176.14
* ($153,761.51)
1944
1,445,018.70
660,203.44
173,156.97
* ($126,413.74)
1945
1,289,214.84
732,561.91
107,790.24
1946
679,420.51
452,765.42
59,879.82
1947
1,665,891.06
1,070,307.41
271,387.75
1948
1,262,807.50
443,571.91
435,287.73
1949
503,434.27
381,828.86
19,446.77
1950
282,682.92
259,049.94
(67,638.99)
*72 The 1922 and 1923 losses resulted from a low volume of business. The 1924 profits were attributable to a large contract from Western Electric Company. The losses and meager profits during the period from 1925 through 1929 were due to increased costs and insufficient volume of business. The 1930 profit was again attributable to a large contract from Western Electric Company. The years 1931 through 1936 reflected low volume of business and increased costs. The 1941 through 1945 profits were attributable to the rearmament and war program. Profits for 1946 through 1949 were again attributable to a large contract from Western Electric Company. After the termination of World War II, petitioner did not have sufficient business to keep its entire plant and all of its employees busy, and it had to reduce the number of employees. After petitioner in 1928 or 1929 shifted its emphasis from small work to designing and manufacturing special machines and tools, the use of materials and the production of larger machines required it to have larger and heavier machinery and equipment. Most of petitioner's equipment is large or *73 medium size and consists generally of standard machine tools such as boring mills, shavers, planers, lathes of various types and sizes, grinders, jog borers, shapers, and milling machines. These machines cost from $8,000 to $35,000 apiece to replace. There have been vast improvements in such equipment since petitioner installed its machinery. Petitioner's equipment is less efficient, less productive, and more expensive to operate than the more modern machines. Petitioner has pursued a policy of keeping abreast of the constant improvements in machine tools and has replaced some of its machinery from time to time, but it has not replaced all of it in any one year, and in recent years has made very few replacements, particularly of the larger machines. Prior to World War II petitioner consistently maintained its equipment in good repair. During and after that war period petitioner found it difficult to maintain its machinery in this manner because of the additional operation during the war and because of the inefficiency and lack of skill in its workmen. Petitioner's buildings are not adaptable to remodeling for efficient and economic handling of the type of business in which petitioner *74 has been engaged since before the taxable years. The building's construction does not permit the installation of overhead traveling cranes to provide the most efficient and economic movement about the factory of heavy and large materials and machines. Without such cranes, the materials and machines must be moved by hand and hand trucks which is slow and expensive. Petitioner obtained priorities from the United States Government for necessary materials to construct an addition to its building in 1941. Petitioner made no other applications for priorities for building additions after 1941. Petitioner also obtained Government priorities for machinery and equipment during the taxable years 1942, 1943 and 1944. During the period from April 30, 1920 to April 30, 1944, petitioner made additions to its plant and equipment costing $496,358.26; there were charged off items having a cost of $171,797.12 resulting in net additions of $324,561.14. As of April 30, 1944, the plant and equipment used in the business had a cost of $547,691.77. The plant and equipment on hand April 30, 1944, included items acquired during the period 1910 to 1924 at a cost of $69,184.89, items acquired during the period *75 1925 to 1934 at a cost of $87,584.93 and items acquired in the period 1935 to 1944 at a cost of $390,921.95. Of those items acquired in 1935 to 1934, items costing $116,462.26 were acquired in 1938 and items costing $107,923.43 were acquired in 1942. In the period 1945 to 1949, inclusive, there were additions to plant and equipment at cost of $56,549.71 and there were charged off items at cost of $7,193.40 or net additions at cost of $49,356.31. The plant and equipment - depreciable property - in use at April 30, 1944, included property acquired in the years and at costs as follows: Shop Fix-
Machinery
Furniture and
Autos
tures and
Tools and
Year
Buildings
Gauges
Fixtures
and Trucks
Equipment
Equipment
1937 and
Prior
$107,652.54
$ 685.44
$ 133.92
$ 3,902.12
$ 86,147.53
1938
236.96
4,803.25
103,814.43
1939
673.65
1,548.39
1940
23,173.12
1941
771.28
362.38
1,113.07
950.00
$ 3,141.95
48,993.35
1942
30,227.48
188.04
310.16
9,015.28
61,302.97
1943
693.51
199.00
1,230.00
15,217.44
1944
4,750.00
28,314.00
$144,094.81
$1,425.86
$1,794.11
$10,329.03
$13,387.23
$368,511.23
Total
$539,542.27
Obsolete machinery per R.A.R.
$15,700.00
Capital improvements per R.A.R.
1,849.50
17,549.50
$557,091.77
Less: Assets restored by R.A.R. 1938
$ 8,000.00
Less: Increase in capital gain R.A.R. 1942
1,400.00
9,400.00
Total plant and equipment
$547,691.77
*76 At April 30, 1944, the estimated remaining life, as determined by Internal Revenue Agents, of the buildings was 4 years, of shop fixtures and equipment was 4 1/2 years, of machinery, tools and equipment was 12 years, and of gauges, office furniture and fixtures, and autos and trucks was variable. In determining depreciation rates petitioner estimated the useful life of the buildings and of the shop fixtures and equipment would expire in 1948 and the useful life of autos and trucks would expire in 1946. The depreciation for machinery and equipment was determined upon the basis of productive hours of use and not upon years of life. The normal productive hours of use was determined to be 175,000 per year. During the war years the productive hours of use were much greater, being 440,000 in one year. The years of useful life would be variable, with a minimum of ten years. At least 75% of the machinery and equipment was 10 years old or more as of 1942. The plant, exclusive of land, and equipment at cost, the depreciation reserve based upon cost, the capital stock and the surplus of petitioner for each of the fiscal years 1916 to 1950, inclusive, as shown by its books and not reflecting *77 any adjustments by the Bureau of Internal Revenue or with respect to renegotiation of excessive profits, are as follows: Plant and
Depreciation
Year
Equipment
Reserve
Capital Stock
Surplus
1916
$157,126.41
$ 20,666.38
$ 60,000.00
$152,201.30
1917
166,514.70
32,253.64
60,000.00
93,949.87
1918
195,367.75
46,414.48
120,000.00
176,842.59
1919
203,141.52
73,708.39
120,000.00
212,235.69
1920
218,430.66
86,930.69
200,000.00
138,720.48
1921
233,250.85
110,705.19
200,000.00
182,712.36
1922
239,949.98
128,719.00
200,000.00
155,033.54
1923
239,949.98
147,418.86
200,000.00
133,549.30
1924
244,654.44
167,868.57
200,000.00
242,158.37
1925
244,654.44
186,200.06
200,000.00
213,926.62
1926
244,654.44
199,488.53
200,000.00
219,698.41
1927
244,654.44
187,818.84
200,000.00
256,604.30
1928
251,691.36
197,146.90
200,000.00
270,496.57
1929
318,410.00
207,324.95
200,000.00
262,704.46
1930
326,276.89
222,034.52
200,000.00
615,284.02
1931
326,276.89
232,311.06
200,000.00
589,329.10
1932
326,276.89
242,455.82
400,000.00
346,444.90
1933
326,276.89
247,510.35
400,000.00
273,036.57
1934
326,276.89
252,433.79
400,000.00
267,278.29
1935
178,355.37
106,864.11
400,000.00
249,670.29
1936
178,131.99
113,395.98
400,000.00
251,012.94
1937
200,704.14
124,608.47
400,000.00
276,531.10
1938
306,361.03
141,352.21
400,000.00
296,189.05
1939
322,984.82
159,747.99
400,000.00
305,325.74
1940
348,007.44
174,955.23
400,000.00
304,607.76
1941
399,502.39
207,144.10
400,000.00
380,646.27
1942
497,296.82
240,835.80
400,000.00
503,119.15
1943
514,627.77
287,859.27
400,000.00
711,295.29
1944
547,691.77
329,103.56
400,000.00
880,452.26
1945
548,314.57
371,462.03
800,000.00
352,903.78
1946
548,314.57
403,657.27
800,000.00
342,733.60
1947
596,066.76
448,586.98
800,000.00
574,121.35
1948
595,975.27
468,667.62
800,000.00
969,409.08
1949
597,048.08
489,299.52
800,000.00
947,721.84
1950
593,083.54
501,935.06
800,000.00
879,174.85
*78 The depreciation reserves shown in the foregoing statement are based upon the original cost of buildings, machinery and equipment and other depreciable assets. The cost of replacement in January 1948 of the buildings of petitioner is $497,864.43, including power mains and piping, the replacement costs of which are $17,213.38 and $2,088.93, respectively. At April 30, 1944, the actual cost of the buildings, which then had an estimated remaining life of 4 years, to the petitioner is $144,094.81. No additions to the buildings were made by petitioner between April 30, 1944, and April 30, 1948. The cost of replacement or reproduction of the buildings at April 30, 1944, is 70% of such cost as of January 1948 ($497,864.43), which is $348,505.10, and there is no appreciable difference in such cost at April 30, 1942, 1943 and 1944, when prices were frozen under Government war time controls. The cost of replacement in January 1948 of all equipment used in petitioner's business, exclusive of power mains and piping included in the buildings, is $1,349,651.65 ($1,368,953.96 minus $19,302.31). Included in such general classification of equipment are gauges, office furniture and fixtures, autos *79 and trucks, shop fixtures and equipment, and machinery, tools and equipment as classified on petitioner's records. The cost of replacement in January 1948 of the gauges is $15,896.83; of the office furniture and fixtures is $13,030.86; of the autos and trucks is $880; of the shop fixtures and equipment is $31,631.82; and of the machinery, tools and equipment is $1,288,212.14. At April 30, 1944, the actual cost to petitioner of the machinery, tools and equipment is $368,511.23 and of all equipment in all of the several classifications is $395,447.46. Between April 30, 1944 and April 30, 1948, petitioner charged off equipment in the amount of $7,193.40 and made additions to equipment in the amount of $55,476.90, or net additions in the amount of $48,283.50. The cost of replacement or reproduction of the equipment of all classifications as a whole at April 30, 1944, is 67% of such cost in January 1948 ($1,349,651.65), which is $904,266.61 and there is no difference in such cost at April 30, 1942, 1943 and 1944. The depreciation reserves for plant and equipment at April 30, 1942, 1943 and 1944, computed on the replacement costs at such dates is about three times the depreciation reserves *80 computed upon actual costs and as shown on the records of petitioner, or $722,507.40 for 1942, $863,577.81 for 1943, and $987,310.68 for 1944. As shown by the books of petitioner, not reflecting any adjustments by the Bureau of Internal Revenue or with respect to renegotiation of excessive profits, the current assets, the current liabilities, the cash and bonds, the inventories and the receivables for each of the fiscal years 1916 to 1950, inclusive, are as follows: Current
Current
Receivables
Year
Assets
Liabilities
Cash and Bonds
Inventories
Accts. and Notes
1916
$ 74,987.41
$ 30,378.24
$ 3,480.63
$ 52,201.10
$ 18,452.80
1917
99,738.85
112,653.50
8,273.65
62,859.02
25,842.47
1918
143,820.38
35,836.37
16,726.12
84,277.03
38,819.63
1919
175,636.96
15,083.25
82,019.62
62,004.76
24,367.96
1920
207,938.49
37,488.64
79,760.24
71,924.67
55,179.28
1921
235,786.75
12,390.71
134,592.40
31,815.12
68,625.17
1922
220,009.63
8,274.51
144,797.08
29,709.81
45,238.27
1923
244,379.43
35,428.69
139,317.67
47,187.58
57,723.60
1924
345,939.10
12,634.04
238,875.35
50,257.41
53,662.18
1925
345,596.38
22,191.58
226,867.08
32,597.43
83,313.87
1926
345,963.99
3,498.93
220,353.65
40,129.76
82,884.44
1927
371,080.19
3,378.93
227,919.90
57,328.63
83,866.64
1928
387,591.57
3,706.90
273,627.62
31,552.97
80,051.28
1929
437,300.31
117,756.34
212,278.26
120,209.24
101,151.60
1930
708,967.68
53,441.77
593,417.80
23,736.05
87,882.63
1931
645,372.29
10,296.08
558,916.40
24,188.80
57,130.71
1932
631,260.78
32,161.14
529,285.06
20,970.43
76,060.63
1933
568,450.01
6,247.42
481,487.69
18,699.34
66,433.10
1934
572,520.35
11,152.60
429,244.61
19,447.27
121,886.31
1935
582,570.04
40,956.95
528,605.38
24,083.60
28,191.17
1936
585,504.14
35,793.15
451,235.00
30,891.64
101,464.61
1937
626,146.25
62,779.61
448,239.27
51,866.18
123,674.98
1938
534,472.82
39,808.53
452,278.57
19,497.57
60,851.28
1939
532,798.62
13,202.40
395,584.79
13,245.32
110,897.01
1940
518,185.05
20,235.05
347,616.08
28,405.44
140,869.80
1941
620,836.48
65,986.77
431,018.45
29,406.35
157,919.50
1942
823,877.00
212,248.29
613,890.31
42,913.98
162,960.45
1943
1,503,096.88
655,631.30
1,147,072.12
53,016.76
300,880.57
1944
1,564,612.25
539,663.09
1,370,327.55
43,404.19
149,713.16
1945
1,362,727.04
423,781.84
1,214,063.59
30,339.72
117,777.21
1946
1,226,087.63
265,329.74
1,118,620.07
62,943.88
43,794.13
1947
1,409,586.56
220,345.08
1,242,988.42
64,777.55
101,202.29
1948
1,899,393.51
294,008.62
1,820,222.63
31,914.30
43,940.60
1949
1,628,956.81
24,543.48
1,554,636.36
36,684.88
34,173.09
1950
1,655,210.29
102,642.63
1,549,105.81
57,697.91
47,491.45
*81 The bonds included in the column Cash & Bonds are United States Government bonds, except for an amount of $20,000 which represents a certificate of deposit in a building and loan association that petitioner has carried for years more as a matter of sentiment than anything else. The depreciation reserve based upon cost, the inventories, the receivables, the total of such items, and the surplus of petitioner for each of the fiscal years 1940 to 1944, inclusive, and for each of the fiscal years 1945 to 1950, inclusive, are as follows: Depreciation
Year
Reserve
Inventories
Receivables
Total
Surplus
1940
$174,955.23
$28,405.44
$140,869.80
$344,230.47
$304,607.76
1941
207,144.10
29,406.35
157,919.50
394,469.95
380,646.27
1942
240,835.80
42,913.98
162,960.45
446,710.23
503,119.15
1943
287,859.27
53,016.76
300,880.57
641,756.60
711,295.29
1944
329,103.56
43,404.19
149,713.16
522,220.91
880,452.26
1945
371,462.03
30,339.72
117,777.21
519,578.96
352,903.78
1946
403,657.27
62,943.88
43,794.13
510,395.28
342,733.60
1947
448,586.98
64,777.55
101,202.29
614,566.82
574,121.35
1948
468,667.62
31,914.30
43,940.60
544,522.52
969,409.08
1949
489,299.52
36,684.88
34,173.09
560,157.49
947,721.84
1950
501,935.06
57,697.91
47,491.45
607,124.42
879,174.85
*82 The inventories, the materials purchased, the payrolls, the total thereof, and the net current assets of petitioner for each of the fiscal years 1940 to 1944, inclusive, and for each of the fiscal years 1945 to 1949, inclusive, are as follows: Materials
Net Current
Year
Inventories
Purchased
Pay Rolls
Total
Assets
1940
$28,405.44
$ 23,068.33
$235,709.45
$ 287,183.22
$ 497,950.00
1941
29,406.35
23,598.47
371,204.49
444,209.31
554,849.71
1942
42,913.98
39,525.68
458,919.74
541,359.40
610,828.71
1943
53,016.76
136,386.47
674,408.81
863,812.04
847,465.58
1944
43,404.19
129,074.66
557,879.79
730,358.64
1,024,949.16
1945
30,339.72
229,862.68
527,014.84
787,217.24
938,945.20
1946
62,943.88
83,225.78
442,917.01
589,086.67
960,757.89
1947
64,777.55
385,868.67
726,832.58
1,177,478.80
1,189,241.48
1948
31,914.30
58,838.34
405,774.96
496,527.60
1,605,384.89
1949
36,684.88
86,005.87
346,112.71
468,803.46
1,604,413.33
During part of the fiscal year 1942, all of the fiscal years 1943 and 1944, and until near the close of the fiscal year 1945 petitioner was engaged almost exclusively in war work *83 such as the production of cam cases used in hydraulic equipment for lifts and steering mechanism on battleships and ammunition hoists. During this period skilled labor was scarce and the labor obtainable was inefficient, indifferent and not more than 60% as productive as labor prior to the war. This inefficiency and nonproductivity continued into the post-war period. During the war and post-war periods petitioner employed union labor under union contracts and was always being pressed for increases, pensions and other fringe benefits. The costs of labor and materials during 1942 to 1945 were substantially higher than previous costs, and these costs continued to increase thereafter. Petitioner's war work slacked off near the close of its fiscal year 1945, and there were cancellations of contracts for such work. Although petitioner had no notice of termination of any war contracts prior to the early part of 1945, it had experienced the drastic economic readjustments after World War I, and anticipated during the taxable years that a substantial slackening of business would occur immediately after World War II. Petitioner has always financed its operations, expansions, and improvements *84 with the earnings of the business. Except for an occasional small demand loan from the bank as a temporary expedient, petitioner has not borrowed in any form. Petitioner did not receive any financing from the Government or from its prime contractors during the years 1942 to 1945, and it did not receive advances at any time from its customers on jobs under order. Petitioner never made any investigations in order to ascertain whether any financing method was feasible other than out of earnings. Petitioner's officers were unaware of how its competitors financed their operation. Before the close of its fiscal year 1942 petitioner knew of the legislation then pending in Congress which became the first Renegotiation Act, and knew that its earnings and profits might be subject to renegotiation. They had been informed of this through Business Services, to which they subscribed, as well as having read about it in the newspapers. By letter dated April 17, 1944, which was the first official notice to petitioner in connection with renegotiation of its contracts and profits, the War Department of the United States advised petitioner that the matter of conducting its statutory renegotiations under *85 the law, copies of which were enclosed, had been assigned to the indicated office of the War Department and requested that petitioner furnish the information called for by the "Standard Form Of Contractor's Report" enclosed with the letter. By letter dated April 7, 1945, the War Department of the United States notified petitioner that the Under Secretary of War had made a unilateral determination that $550,000 of the profits realized by it during its fiscal year April 30, 1943, under its contracts subject to renegotiation, were excessive and enclosed an executed original of such unilateral determination. Payment to the United States of the excessive profits so determined, less the tax credit provided by section 3806 Internal Revenue Code, was directed. By letter dated April 18, 1945, the War Department advised petitioner that, as reported by the Internal Revenue Agent in Charge, it was entitled to a tax credit in the amount of $456,744.01 against the excessive profits determined for the fiscal year 1943 and demanded payment of the balance of such excessive profits, amounting to $93,255.99, with notice that interest at the rate of 6% per year on any amount thereof *86 unpaid would accrue from and after April 30, 1945. On April 27, 1945, petitioner paid to the United States the excessive profits so determined for its fiscal year 1943, after credit for taxes paid, in the net amount of $93,255.99. For its fiscal year 1943 petitioner paid excess profits taxes in the amount of $584,146.25 and income taxes in the amount of $30,899.81 or aggregate income and excess profits taxes in the amount of $615,046.06. For its fiscal year 1942 petitioner paid excess profits taxes in the amount of $115,660.02 and income and declared value excess profits taxes in the amount of $66,083.14 or aggregate income and excess profits taxes in the amount of $181,743.16. On January 23, 1945, in response to a long distance telephone request about two or three days or a week prior thereto from the War Department, petitioner furnished the War Department a breakdown of its sales for its fiscal year ending April 30, 1944. On February 24, 1945, petitioner was advised that renegotiation proceedings under the Renegotiation Act for its fiscal year April 30, 1944, would be conducted by the Navy Department, that a representative of the Navy Price Adjustment Board would visit its plant *87 on March 2, 1945, and that a conference with petitioner with respect to the matter had been set for 9:00 A.M., April 2, 1945, at Washington, D.C. Thereafter, petitioner entered into a Renegotiation Agreement dated April 13, 1945, with the Navy Price Adjustment Board, acting in the name of the United States, determining and agreeing that $420,000 of the profits derived by petitioner during its fiscal year April 30, 1944, were excessive and should be eliminated pursuant to the Renegotiation Act. It was provided that petitioner was entitled to a tax credit in the amount of $360,700.82 in respect of such excessive profits and petitioner agreed to pay to the Government the net amount of such excessive profits less the tax credit, namely, $59,299.18 in instalments. This amount was paid to the United States by petitioner in practically equal instalments on April 27, 1945, July 5, 1945, November 5, 1945, and March 4, 1946. For its fiscal year 1944 petitioner paid income taxes in the amount of $38,222 and excess profits taxes in the amount of $467,432 or aggregate income and excess profits taxes in the amount of $505,654. In August 1945 petitioner was notified that its profits and contracts *88 for its fiscal year April 30, 1945, would be renegotiated and thereafter it was determined that its profits for such year were excessive in the amount of $190,000. Petitioner paid $27,550 to the United States being the amount of such excessive profits less the tax credit applicable thereto. For its fiscal year 1945 petitioner paid income taxes in the amount of $46,714 and excess profits taxes in the amount of $275,623 or aggregate income and excess profits taxes in the amount of $322,337. Petitioner was not renegotiated by the United States Government with respect to excessive war profits for the taxable years ended April 30, 1941, and 1942. Petitioner carried substantial amounts in Government securities as a form of repository for its funds, and not for the income return on an investment, because it felt that such form was the best way to keep its money rather than leave it in a bank account. The securities could be cashed at any time petitioner required the funds and they were considered another form of cash. The officers and directors, and the consultant, of petitioner considered that the surplus carried and maintained by petitioner was essential to meet the reasonable needs *89 of the business and that the business required petitioner to maintain a substantial liquid financial position. On several occasions petitioner had received a large order of a million dollars or more primarily because of its ability to finance the job and its operations without requesting advances from the customer or borrowing, which jobs petitioner had reason to believe it would not have obtained had it not been in a strong liquid financial position. The normal ratio of current assets to current liabilities, the normal working capital position, for petitioner's type of business is about 6 to 1. Petitioner declared and paid cash dividends in each of the years since December 20, 1931, in the amount of $4,000 or at the rate of $1 per share on its outstanding capital stock, except in the fiscal year 1938 when it declared and paid a cash dividend of $20,000. It paid cash dividends of $150,000 in 1916 and $50,000 in 1923. In each year the dividend was declared and paid after due consideration by the directors of the current and prospective business of petitioner and of its financial position. During the depression years of 1931 and following the directors of petitioner found it necessary, *90 because of adverse business conditions, to reduce the salary of its President, on his own motion, from $50,000 to $20,000 per year, to reduce the salaries of other officers and employees, and to otherwise curtail expenses. The directors, and the consultant or fiscal advisor of petitioner, were not influenced in determining the dividends to be paid by the fact that larger dividends would increase the tax liability of the stockholders. In connection with the 1932 stock dividend, the minutes of the meeting of petitioner's Board of Directors held on January 5, 1932, contain in part the following: "The President stated that due to adverse business conditions, the operations of the Company for the eight months ended December 31, 1931, had resulted in a loss. He further stated that every effort was being made to economize, that expenditures for expense, repairs, maintenance, etc., etc., had been curtailed. Also that salaries and wages had been reduced so that losses could be reduced to the minimum and particular attention was being directed to maintaining the financial position of the Company so that sufficient working capital would be available to finance the Company's operations without *91 borrowing, when business was again restored to normal. "Having regard to present conditions and the desire of the management to conserve working capital, the President stated that he would not recommend the advisability of further cash dividend payments for at least the present. "A Balance Sheet of the Company as of December 31, 1931, was presented for inspection and discussion. During the discussion the suggestion was offered that in view of the surplus shown by the Balance Sheet and the fact that the Company held Two Thousand (2,000) Shares of its authorized and heretofore unissued Capital Stock, of the par value of $100.00 per Share, that a Stock Dividend might be distributed. "The President stated that he had no objection to such action, provided that for the present at least, it would involve no cash outlay. He then stated that he would entertain a motion. "On motion made, duly seconded and unanimously carried, the following Resolution was adopted. "RESOLVED, that a Stock Dividend equal to One Hundred (100) per cent of the Company's stock outstanding be and the same is hereby declared, the same to be issued to holders of Stock of Record as of January 25, 1932. Be it *92 further resolved that the said Stock Dividend equal to Two Hundred Thousand (200,000.00) Dollars be charged to Surplus. "There being no further business to come before the Board of Directors, upon motion made, duly seconded and carried, the meeting adjourned." The books of petitioner disclose a "loan" to Price in 1939 in the amount of $63,583. This represents the cash surrender value of life insurance previously carried by petitioner on the life of Price, which Price purchased from petitioner in 1939, giving his demand note to petitioner in that amount. Payments on the note were made from time to time, and interest was paid on the amounts due. The note was paid in full in cash before the close of the fiscal year 1944. Petitioner carried open or running accounts on its books for each of the stockholder members of the Price family, to which there were credited the salaries and other amounts due to them from petitioner and to which there were charged amounts paid out by petitioner for their personal account or benefit. These open accounts at times showed credit balances in favor of the stockholder and all accounts have been fully paid to petitioner from time to time. Except for the *93 open accounts of the three children, of whom one owned only 2 shares of stock and the other two owned only 1 share of stock each in the taxable years, interest was charged and paid on monthly average balance in the open accounts. Petitioner's earnings or profits were not permitted to accumulate during the taxable years beyond the reasonable needs of the business as they existed during such taxable years. Petitioner was not availed of during the taxable years for the purpose of preventing the imposition of surtax on its stockholders by permitting gains and profits to accumulate instead of being divided or distributed. Opinion KERN, Judge: Petitioner and respondent are agreed that the question of whether this petitioner is liable for the surtax imposed by section 102 of the Internal Revenue Code is essentially a fact question and must depend upon a resolution of all the evidence and the weighing of all the pertinent factors established by the voluminous record herein. See Helvering v. National Grocery Co., 304 U.S. 282. After a careful review of the entire record and after weighing to the best of our ability the pertinent factors established *94 by the evidence, we have concluded and found that petitioner's accumulations of earnings and profit were not beyond the reasonable needs of its business during the taxable years which were fraught with the extraordinary problems of global war and its economic aftermaths, and that petitioner was not availed of during the taxable years for the inhibited purpose. These ultimate conclusions dispose of the issue relating to the applicability of section 102 to petitioner during the taxable years. However, it should be clearly noted that we do not attempt now to decide any such issue relating to prior or subsequent years, or indicate our view as to how long petitioner could properly continue to accumulate its earnings. The next issue is whether the gain on the condemnation of property belonging to petitioner is not to be recognized under I.R.C. Section 112 (f). The introductory provisions of the section and the section itself are as follows: "SEC. 112. RECOGNITION OF GAIN OR LOSS. (a) General Rule. - Upon the sale or exchange of property the entire amount of the gain *95 or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section. * * *
"(f) Involuntary Conversions. - If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain shall be recognized, but loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized to the extent of the money which is not so expended (regardless of whether such money is received in one or more taxable years and regardless of whether or not the money which is not so expended constitutes gain)." Respondent does *96 not here contend that petitioner has not complied with the statutory requirements relating to the establishment of the replacement fund and its use to purchase the new property. Respondent appears primarily to resist the application of section 112 (f) because the disparity in size between the two pieces of property eliminates the possibility of the two properties being "similar or related in service or use", as required by the pertinent section, and points out the peculiar importance of such disparity in a case such as this where the two properties are unimproved. No two pieces of real estate can be similar in all respects; and the same might be said of many types of personalty. We are satisfied that considerable latitude in respect to the similarity of property was contemplated by the statute and must be permitted. Indeed, the addition of the phrase "or related in service or use" demonstrates the legislative intent to give a broad interpretation to the statute. See Paul Haberland, 25 B.T.A. 1370. And we have recently noted that section 112 (f) is a relief provision which should be liberally construed to effectuate its purpose. Massillon-Cleveland-Akron Sign Co., 15 T.C. 79, 83. *97 A few examples of previous adjudications disclose how great this latitude of interpretation has been. In August Buckhardt, 32 B.T.A. 1272, 2 1 /2 acres of the taxpayer's 5 1/2-acre farm were condemned. The taxpayer acquired a 20-acre farm which was held to be "similar or related in service or use". In Cotton Concentration Co., 4 B.T.A. 121, the substituted storage shed was about double the capacity of the replaced one, and we held that there was no taxable gain under an earlier statute, which was of like import to the one here considered. The new property here was of similar class and location in that it was industrial property located in the same city and adjacent to the same public services and labor market; and the variation of size we do not regard as of controlling significance. Both the piece sold and the piece acquired adequately served petitioner as the site for its contemplated plant expansion. Nor are we concerned under the present facts by reason of the circumstance that petitioner acquired the new site from its president and substantial stockholder. The evidence establishes to our satisfaction that the purchase price was approximately the *98 then current fair market value of the property, and that the site was appropriate to petitioner's purposes. But even if petitioner had a "bargain purchase", there appears no reason why this should foreclose the application of section 112 (f). See Kimbell-Diamond Milling Co., 10 T.C. 7. The last issue concerns the deductibility of attorney fees and real estate appraiser fees. Petitioner contends that the fees in question were spent resisting the sale of the real estate to the Government and protecting petitioner's interests therein, and that these fees can not be eliminated as deductible expenses because they were in defense of title or costs of the sale. Some part of these fees, however, were clearly incident to the negotiation and ascertainment of the purchase price. This being so, L. B. Reakirt, 29 B.T.A. 1296, affd. (CA-6) 84 Fed. (2d) 996 which is primarily relied upon by petitioner and which dealt only with fees connected with an attempt to enjoin the condemnation of property, can not control here. And Chicago Dock & Canal Co., 32 B.T.A. 231, affd. (CA-7) 84 Fed (2d) 288, also relied upon by petitioner, is *99 distinguishable as a case treating only with fees relating to the reduction of the amount of an assessment. We perceive no error in respondent's position that these fees are not deductible expenses, but are capital items which would ordinarily be offset against the amount received for the property, but under the present circumstance of a section 112 (f) non-taxable transaction must be added to the basis of the new property. Cf. William Justin Petit, 8 T.C. 228, and H. C. Naylor, 17 T.C. 959. Decision will be entered under Rule 50. Footnotes
*. Not including Post War Refund Credit for excess profits tax.↩